**Sam W. AIENA, et al., Plaintiffs,**

v.

**David A. OLSEN, et al., Defendants.**

**Burt N. Sempier, Plaintiff,**

v.

**David A. Olsen, et al., Defendants.**

Nos. 97 Civ. 8713(LAK),
98 Civ. 5549(LAK).

United States District Court,
S.D. New York.

Oct. 12, 1999.

Michael L. Hirschfeld, Scott A. Edelman, Milbank, Tweed, Hadley & McCloy, New York City, for Plaintiffs in Aiena.

Gerald A. Liloia, Julian W. Wells, Riker, Danzig, Scherer, Hyland & Perretti LLP, Morristown, NJ, for Plaintiff Burt N. Sempier.

Paul C. Saunders, Elizabeth L. Grayer, Cravath, Swaine & Moore, New York City, for Defendants.

William P. Frank, Marco E. Schnabl, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, for Corporate Defendants.

## OPINION

KAPLAN, District Judge.

In March 1997, Johnson & Higgins ("J & H"), a well known and closely held insurance firm, was sold to Marsh & McLennan Companies, Inc. ("Marsh") for aggregate consideration valued at $1.8 billion. Plaintiffs, former J & H director-shareholders who retired prior to the Marsh deal and, upon retirement, sold their J & H shares back to the company for certificates entitling them to receive for ten years payments equivalent to dividends on the shares they sold, were paid nearly $300 million for their certificates as part of the transaction. They claim, however, that the J & H directors—who owned all of its shares at the time of the Marsh deal, approved the sale, and received at least $36 million each—took too great a share of the sale proceeds for themselves and did so by manipulating J & H's corporate machinery improperly and otherwise betraying duties they owed to the plaintiffs. The matter now is before the Court on defendants' motions for judgment on the pleadings dismissing the first amended complaint in *Aiena* and the complaint in *Sempier*.[1]

### Facts

Although these are motions addressed to the face of the pleadings, defendants have submitted a number of other documents in support of their motions. In view of the complexity of the matter and the fact that plaintiffs' discovery has been limited at best, the Court declines to convert the motions into motions for summary judgment.[2] Nevertheless, certain documents submitted by defendants effectively are incorporated by reference in the complaints and therefore properly are considered on this motion.[3] Accordingly, the well pleaded factual allegations of the complaints, as supplemented by these documents, are deemed true for purposes of the motions.

### J & H Stock Ownership, Director Retirement Policy and Ten Year Certificates

J & H's Certificate of Incorporation and By-laws provided for the management of

---

1. Earlier this year, the Court denied plaintiffs' motion for a preliminary injunction. *Aiena v. Olsen*, 37 F.Supp.2d 303 (S.D.N.Y.1999).

2. *See* FED. R. CIV. P. 12(b), (c); *Gurary v. Winehouse*, 190 F.3d 37, 42 (2d Cir.1999).

3. *E.g., Strom v. Goldman, Sachs & Co.,* —— F.3d ——, —— n. 1, No. 98–7090, 1999 WL 639844, at *12 n. 1 (2d Cir. Aug. 24, 1999).

The documents so incorporated are the J & H certificates of incorporation and by-laws, the Ten Year Certificates, Marsh's Form 8–K with respect to the transaction, and the agreements by which plaintiffs sold their Ten Year Certificates to Marsh. Schnabl Decl. Ex. B, C, E. F, H, I, L. The documents are considered only for non-hearsay purposes. *See, e.g., Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991).

its business and affairs by a board of directors and, prior to the Marsh deal, restricted ownership of J & H common stock to active officers, directors or employees of J & H. In the event J & H common stock became the property of anyone other than an active officer, director or employee, the stock immediately lost its entitlement to dividends and became subject to mandatory repurchase by J & H at a price equal to the average annual dividend that had been paid on the shares over the preceding five years unless the shares were owned by a director retiring from active service.[4]

J & H required all directors who had served for at least 15 years to retire at the age of 60. Those whose service at their 60th birthdays fell short of 15 years were required to retire at age 62.[5]

Under the terms of the Certificate of Incorporation, each retiring J & H director was given the option, upon retirement, either to sell his or her stock back to J & H in exchange for an amount equal to one year's dividend or, upon execution of an agreement containing a covenant not to compete for five years, to exchange his or her stock for a Ten Year Certificate. Each certificate entitled the retired director to continue to receive, for the remainder of the fiscal year in which it was issued and for each of the ten ensuing fiscal years, an amount equal to the dividends that would have been payable to the retired director if he or she still held the shares of J & H common stock exchanged for the certificate.[6] As the latter course was more favorable to the retiring director, all retirees chose that option.[7] The shares of J & H common stock surrendered by retired directors in exchange for Ten Year Certificates, over time, were allocated to and made available for purchase at a nominal cost by the active directors. Those shares, however, did not pay dividends until the expiration of the Ten Year Certificates that had been issued in exchange for them.[8]

In addition to retaining the substantial equivalent of the right to receive dividends on the common stock exchanged upon their retirements for Ten Year Certificates, the certificate holders retained certain voting rights in connection with a sale of J & H. As previously noted, the transferability restrictions in the Certificate of Incorporation and By-laws rendered it impossible for shareholders to sell their shares to a third party such as Marsh. In consequence, the only means of transferring ownership and control of J & H's business was by a sale of all or substantially all of its assets. Under the terms of the Certificate of Incorporation, however, any sale of "all the property of" J & H required the approval of the holders of at least two-thirds of the outstanding Ten Year Certificates, measured by share equivalent. In the event such a sale were approved, the sale proceeds were to be distributed as a dividend on the common stock and the Ten Year Certificates. In consequence, given the dividend allocation between the retired director plaintiffs and the incumbent directors that existed prior to the Marsh transaction, approximately 75 percent of any such liquidating dividend would have been payable to the Ten Year Certificate holders absent their agreement to the contrary.[9]

*Non-Shareholder Directors*

Until 1994, J & H's Certificate of Incorporation and By-laws required that all directors own at least 500 shares of J & H common stock. As a result of J & H's

---

4. Cpt ¶ 60. *Accord,* Schnabl Ex. B, Art. Fourth.

 All references to the complaint are to the first amended complaint in *Aiena,* which is identical in all substantial respects to the *Sempier* complaint.

5. Cpt ¶ 62.

6. *Id.* ¶¶ 63–64; Schnabl Decl. Ex. B, Art. Fourth, and Ex. C, Art. IV.

7. Cpt ¶ 63.

8. *Id.* ¶ 64.

9. Cpt ¶ 66; Schnabl Decl. Ex. B, Art. Seventh, at 13.

global expansion, however, it amended those instruments in December 1994 to permit the election of three non-shareholder directors who were executives of foreign affiliates of J & H.[10]

*The Marsh Transaction*

*Amendment of the Charter and By-laws to Permit Stock Transfer*

In March 1997, J & H's incumbent directors negotiated a sale of all of the stock of J & H to Marsh for a combination of cash and Marsh securities.[11] In order to effect the transaction, they amended the charter and by-laws to delete the provisions restricting ownership of J & H shares to J & H directors. Moreover, they structured the transaction as a sale of stock, rather than of assets, for the purpose of circumventing the requirement that sale of all of J & H's property be approved by two-thirds in interest of the Ten Year Certificate Holders.[12]

*The Tax Deal*

There was also a tax motive for the transaction structure that plaintiffs claim is relevant here. By reason of the restriction on the transferability of J & H stock, the stock was subject to Section 83 of the Internal Revenue Code[13] prior to the Marsh transaction. In consequence, the dividends were taxed as ordinary income to the stockholder-employee recipients and were deductible by J & H as ordinary and necessary business expenses for compensation paid.[14] The elimination of the transferability restrictions in the Certificate of Incorporation and By-laws, however, allegedly triggered compensation income to the J & H stockholders in the amount by which the market value of J & H shares exceeded the *de minimis* cost of the stock to the shareholders, which was most of the $1.8 billion purchase price that March agreed to pay. The act of amending these instruments thus created an enormous ordinary income tax liability for the incumbent directors while at the same time raising the possibility that J & H or, more accurately, Marsh, could claim the same $1.8 billion as a business expense deduction for 1997.[15]

**10.** Cpt ¶¶ 61, 73–76.

**11.** *Id.* ¶ 79.

**12.** *Id.* ¶¶ 79, 81–82.

The plaintiffs proceed here on the assumption that a change of control over J & H's business by means of an asset sale would have required the approval of two-thirds of the Certificate Holders. It is interesting to note that the wording of the J & H certificate—specifically, the use of the phrase "all the property of" J & H—differs from the wording of most corporation statutes that require shareholder approval of significant asset sales. Such statutes typically impose such a requirement on sales of "all or substantially all" of the corporate assets. *E.g.*, 8 DEL.CODE § 271 (1975–98); N.J. STAT. ANN § 14A–10–11 (West 1999); N.Y. BUS CORP. L. § 909 (McKinney 1986). Corporation statutes containing the "all or substantially all" formulation often have been construed liberally in favor of requiring shareholder approval for significant transactions. *See, e.g., Gimbel v. The Signal Companies*, 316 A.2d 599, 606 (Del.Ch.), *aff'd without consideration of the point*, 316 A.2d 619 (Del. Sup.1974). In other words, shareholder approval may be required in some circumstances for the sale of considerably less than "all" of the corporate assets. Whether the use of the arguably more limited phrase "all of the property" in the J & H Certificate of Incorporation would have precluded the substantial transfer of J & H's business via a sale of most but not all of the company's assets without the approval of the requisite proportion of Ten Year Certificate holders is an interesting question that has not been briefed and need not now be resolved.

**13.** 26 U.S.C. § 83.

**14.** Cpt ¶ 85.

**15.** *Id.* ¶¶ 86–87.

Plaintiff's suggestion that Marsh would have been the proper party to claim the deduction appears to be based on the fact that J & H was expected to continue as a wholly owned subsidiary of Marsh. Following the acquisition, Marsh presumably would have filed a consolidated tax return including J & H. *See* 26 U.S.C. § 1501 *et seq.* (parent corporation of group consisting of parent and subsidiaries at least 80 percent owned may file consolidated return).

Plaintiffs allege that none of the advisors involved in the deal believed that Marsh could sustain a $1.8 billion deduction generated by the removal of the transferability restriction as an ordinary and necessary business expense. Accordingly, in negotiating the transaction, the J & H directors sought and obtained Marsh's agreement, in exchange for a $300 million reduction in the purchase price, that Marsh would forego the deduction in order to allow the incumbent directors to bargain with the IRS for better tax treatment of the gains on the sale of their J & H stock.[16]

### Approval by J & H Directors

The complaint suggests that approval from a sufficient number of active J & H directors was not obtained easily by the proponents of the transaction. It alleges that certain incumbent directors arranged transfers of J & H stock among themselves and/or from J & H to other incumbent directors so as to equalize their stock holdings and assure that each incumbent director would receive at least $36 million from Marsh.[17] Moreover, they arranged for one of the individual defendants, who had announced his retirement effective January 1, 1997, to be reinstated so that he could participate in the payout made to incumbent directors rather than receive the much smaller payment that would have been made to him as a Ten Year Certificate Holder.[18] Finally, plaintiffs claim that the individual defendants deceitfully caused the three non-stockholder directors not to attend the board meeting at which the Marsh deal was approved,[19] the inference being that they wished to avoid scrutiny of the transaction or, at least, the treatment of the retirees by the only disinterested directors.

### The Deal Is Announced

On March 12, 1997, J & H and Marsh issued a press release announcing the deal. It stated that Marsh had agreed to acquire J & H for $1.8 billion, $600 million of which would be paid in cash and the balance in Marsh stock.[20] It disclosed also that defendants Olsen, Nielsen and Barham, all J & H executives and directors, would join the Marsh board and that Olsen would become vice chairman of Marsh upon the closing of the transaction.

Marsh filed a current report on Form 8–K with the Securities and Exchange Commission on or about March 14, 1997 to which were attached the Stock Purchase Agreement among Marsh, J & H, and the selling shareholders ("SPA") and a registration rights agreement among Marsh and the selling shareholders providing for the registration by Marsh, under certain conditions, of the Marsh securities paid to the selling shareholders and the Ten Year Certificate Holders.[21] The SPA contained, among other provisions,

· J & H's representation that the restrictions on the transferability of the J & H common stock would be removed upon execution of the SPA by persons owning more than 75 percent of J & H's shares,[22]

· Marsh's commitment to offer to each retired director the opportunity to surrender his or her Ten Year Certificates in exchange for cash and stock aggregating, if all retirees accepted, $99,000,001 in cash and $198,000,002 in stock.[23]

### The Offer to the Retired Directors

Following the public disclosure of the Marsh deal, defendants invited the plaintiffs to a meeting on March 19, 1997 at which defendants Olsen, Nielsen, Barham,

---

**16.** See Cpt ¶¶ 88–90.

**17.** Id. ¶ 83.

**18.** Id. ¶ 84.

**19.** Id. ¶ 78(d).

**20.** Schnabl Decl. Ex. H, Ex. 99(a).

**21.** Id. Ex. H.

**22.** Id. § 2.14(e).

**23.** Id. Ex. H, § 6.5(d) & Annex D, Ex. I.

Roxe, Munday, their advisors, J & H's long time legal counsel ("J & H Counsel"), and others presented Marsh's proposal to acquire their Ten Year Certificates.[24] The offer, which by its terms would expire on April 2, 1997 unless previously accepted, was set forth in a form letter distributed to each of the plaintiffs. Its key element was an offer to purchase the Ten Year Certificates at a stated price subject to the certificate holder's agreement to (1) release J & H, Marsh, and their respective insiders from any claims with respect to the Ten Year Certificates, the J & H Certificate of Incorporation and By–Laws, and any ownership interest in J & H, and (2) adopt the non-compete and consulting obligations previously undertaken in connection with the exchange of J & H stock for the Ten Year Certificate.[25]

At the meeting, the incumbent directors told the plaintiffs that they had formed a Sellers' Committee which, with the assistance of J & H Counsel, had acted for the benefit of the plaintiffs.[26] They strongly recommended that plaintiffs accept Marsh's offer to purchase their Ten Year Certificates, an offer they described as generous and highly favorable to plaintiffs.[27] They underscored their recommendation by telling those in attendance that Marsh's offer was the only offer Marsh would make and that it would expire on April 2, 1997.[28] They allegedly did not disclose to plaintiffs that:

· The incumbent directors previously had contracted with Marsh to induce plaintiffs and other retired directors to accept Marsh's offer,[29] and

· The amount of the purchase price offered by Marsh for the Ten Year Certificates had been fixed by the incumbent directors, who had negotiated an aggregate price for Marsh's purchase of J & H and then allocated that consideration as between themselves and the Ten Year Certificate Holders.[30]

In due course, plaintiffs and other retired directors accepted the offers, signed the proffered agreements, surrendered their Ten Year Certificates, and received consideration of nearly $300 million.

### *Plaintiffs' Claims*

Plaintiffs have asserted claims arising under federal statutes as well as common law theories of recovery:

· Count I asserts that the individual defendants breached alleged fiduciary duties to the plaintiffs, primarily on the theory that (a) they manipulated J & H's corporate machinery to further their own interests, presumably by amending the charter and by-laws to permit the sale of their shares to Marsh,[31] (b) transferring shares among themselves in order to procure the votes necessary to approve the deal,[32] (c) allowing one former director to "unretire" and thus obtain a larger share of the proceeds of the sale than he otherwise would have received,[33] (d) improperly procuring the absence of the three non-stockholder directors from the meeting at which the transaction was approved,[34] (e) telling the plaintiffs and other retired directors that the individual defendants had acted in their

24. Cpt ¶ 92.

25. Schnabl Decl. Ex. F.

26. Cpt ¶¶ 93–94.
 Plaintiffs all had dealt with J & H Counsel during their tenures as directors and, indeed, several were represented personally by J & H Counsel at the time of the meeting with respect to family and estate planning matters.

27. *Id.* ¶ 94.

28. *Id.* ¶ 96.

29. *Id.* ¶ 95.

30. *Id.* ¶ 97.

31. *Id.* ¶ 78(a).

32. *Id.* ¶ 78(b).

33. *Id.* ¶ 78(c).

34. *Id.* ¶ 78(d).

interests while at the same time concealing that they had agreed with Marsh to procure plaintiffs' agreement to sell their Ten Year Certificates to Marsh,[35] (f) accepting a lower aggregate purchase price from Marsh in exchange for Marsh's agreement not to seek the $1.8 billion deduction for the purpose of furthering their own efforts to procure favorable tax treatment from the IRS of their personal gains on the transaction,[36] and (g) allocating the aggregate purchase price received from Marsh in a manner that grossly overcompensated the incumbent directors at the expense of the Ten Year Certificate Holders.[37]

· Count II seeks to hold Marsh liable for the individual defendants' alleged breaches of fiduciary duty on an aiding and abetting theory.[38]

· Counts III and IV charge all defendants with violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")[39] and Rule 10b–5 thereunder[40] and common law fraud, respectively. They allege that the Ten Year Certificates were securities within the meaning of the Exchange Act and that the defendants made false statements of material fact or material omissions at the March 19, 1997 meeting, chiefly by asserting that the Marsh offer "was a good offer" without disclosing, among other things, that (a) the incumbent directors, not Marsh, had determined the price offered to the retirees, (b) the offers to the retirees allotted to them an unfairly small portion of the aggregate purchase price, (c) the deal could not take place absent amendment of the Certificate of Incor-

poration and By–Laws, which the incumbent directors had done, (d) approval of the deal by the necessary number of incumbents had been procured only by transfers of shares *inter se,* which amounted to the purchase of the votes of certain directors, (e) the non-shareholder directors had been excluded from participation at the meeting at which the deal had been approved, (f) the incumbent directors were obligated to Marsh to seek to persuade the retirees to accept the offers, (g) the tax deal described above and its effect on the purchase price, and (h) certain facts regarding escrow arrangements affecting payment of the purchase price.[41] Count III further alleges that the plaintiffs, had they been aware of the truth, would not have sold on the terms offered, would have filed suit to block the transaction, and would have succeeded in blocking it absent improvements in the terms offered to them.[42]

· Count V seeks recovery against the individual defendants for the alleged Exchange Act violation under Section 20(a) of the Act[43] on a control person theory.

· Counts VI and VII are asserted against J & H alone and allege that the sale of J & H without the approval of two-thirds of the Ten Year Certificate Holders constituted a breach of contract and a breach of an implied covenant of good faith and fair dealing, respectively.[44]

· Count VIII seeks "equitable relief, restitutionary and otherwise"[45] against all defendants on the theory that J & H's

**35.** *Id.* ¶ 78(e).

**36.** *Id.* ¶ 78(g).

**37.** *Id.* ¶ 98.

**38.** *Id.* ¶¶ 100–02.

**39.** 15 U.S.C. § 78j(b).

**40.** 17 C.F.R. § 240.10b–5.

**41.** Cpt ¶¶ 104–29.

**42.** *Id.* ¶¶ 133–34.

**43.** 15 U.S.C. § 78t(a).

**44.** Cpt ¶¶ 150, 154–56.

**45.** *Id.* prayer for relief, ¶ (b).

Certificate of Incorporation, By–Laws and Ten Year Certificates, coupled with the manner in which the latter were administered, constituted a retirement income plan within the meaning of the Employee Retirement Income Security Act ("ERISA"),[46] that the amendment of the Certificate and By–Laws by the individual defendants was an improper modification or amendment of an ERISA plan, that J & H breached the terms of the alleged plan by manipulating its corporate machinery to the detriment of plaintiffs as plan beneficiaries, and that Marsh is liable, presumably as an aider and abettor, for the individual defendants' breach.[47]

· Count IX charges that the individual defendants were fiduciaries of the alleged ERISA plan and breached their fiduciary duties as previously described.[48]

### Discussion

#### I. ERISA Preemption

Defendants first seek dismissal of all of plaintiffs' state law causes of action on the grounds that (a) plaintiffs allege that the J & H arrangements, including the Ten Year Certificates constituted an ERISA plan, and (b) any state claims relating to those arrangements therefore are preempted by Section 514(a) of ERISA.[49]

Plaintiffs' allegation that the J & H arrangements were an ERISA plan avowedly is made in the alternative to their state law claims. The reason for proceeding in this manner is plain enough. Given the uncertainties concerning (a) whether the J & H arrangements were an ERISA plan and (b) the scope of ERISA preemption, it would be foolish to put all of one's eggs in either the ERISA or the state law basket. Resting solely on ERISA would run the risk that a court ultimately would determine that there was no ERISA plan. Resting solely on the state law theory would run the risk that a court would conclude that there was an ERISA plan and that the state claims were preempted.

■ Rule 8(e)(2)[50] permits such alternative pleading to avoid precisely such dilemmas. Plaintiffs at this early stage are not bound for purposes of their state law claims by their alternative allegation that there was an ERISA plan.[51] Nor are they judicially estopped to deny their ERISA allegation, as that doctrine applies only if the party against which it is asserted has obtained relief on the basis of the allegation that it seeks to disavow.[52]

Turning to the merits, ERISA preemption extends to state law claims that "relate to" "any employee benefit plan" described in 29 U.S.C. § 1003(b).[53] An "employee benefit plan," insofar as is relevant here, is an "employee pension benefit plan," which in turn is a plan, fund or program that "provides retirement income to employees" or "results in a deferral of income . . . for periods extending to the termination of covered employment or beyond . . ."[54]

■ In this case, the Ten Year Certificates (and the income streams to which they entitled their holders) purportedly were given in exchange for the former directors' stock and the execution of non-compete and consulting agreements. It cannot be said on a Rule 12 motion that they provide retirement income or result in a deferral of income. The preemption

---

**46.** 29 U.S.C. § 1001 *et seq.*

**47.** Cpt ¶¶ 162–68.

**48.** *Id.* ¶¶ 170–75.

**49.** 29 U.S.C. § 1144(a).

**50.** Fed. R. Civ. P. 8(e)(2).

**51.** *See, e.g., Adler v. Pataki,* 185 F.3d 35, 41 (2d Cir.1999).

**52.** *E.g., Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1 (2d Cir.1999); *Adler,* 185 F.3d at 41 n. 3.

**53.** 29 U.S.C. § 1144(a).

**54.** *Id.* §§ 1002(3), 1002(2)(A).

argument therefore must be rejected, at least for the present.

## II. ERISA Claims

### A. A Top Hat Plan?

■ Assuming *arguendo* that the J & H arrangements were an ERISA plan, it is impossible to say as a matter of law, as the individual defendants urge, that they were a top hat plan and, in consequence, that the fiduciary responsibility part of the statute did not apply to it. Among the essential characteristics of a top hat plan is that it exist "primarily for the purpose of providing deferred compensation ..."[55] There simply is no basis for concluding, on the face of the pleadings, that the J & H arrangements existed primarily for that purpose. They may have been created to compensate retiring directors for the surrender of their equity interests in the company and to induce them to forego competition with and to consult as requested for their former employer.

### B. Relief Sought/Breach of the Plan

■ Defendants' contentions that plaintiffs have alleged no breach of the plan and in any case are entitled to no relief under Sections 502(a)(1)(B) and 502(a)(3)(B) of ERISA[56] are based on the premise that plaintiffs received all of the benefits to which they were entitled under the J & H plan.[57] This assumes that the alleged beneficial effects for plaintiffs of the restriction on share transferability and the requirement of Ten Year Certificate holder approval for sale of the property of J & H either were not part of the plan or, in any case, were subject to elimination by amendment of the charter. While either or both of those assumptions may prove correct, they are not assumptions that the Court may accept for purposes of a Rule 12 motion.

■ An ERISA plan may be created without the adoption of a formal plan,[58] even unintentionally.[59] Given the lack of required formality and the apparent lack of any conscious intention to create an ERISA plan in this case, it is far from clear how one determines exactly what is and is not included in the plan. None of the parties has addressed the issue. Moreover, if the purposes of the share transferability restriction and the requirement of certificate holder approval of asset sales included protection of the income stream to retirees evidenced by the Ten Year Certificates—certainly not a possibility that may be excluded on a Rule 12 motion—those provisions might well be considered parts of the plan, just as a provision restricting the investment of pension fund contributions to government bonds might be so considered. As the Court cannot say that plaintiffs might prove no facts that would justify a conclusion that the charter provisions were part of the plan, defendants' motion to dismiss the ERISA claims on the assumption that they were not must fail.

Defendants' amendment argument fares no better. The principles governing the ability of a plan sponsor to amend the terms of an ERISA plan depend upon whether it is a top hat plan. If it is, the

**55.** *Id.* § 1101(a)(1).

**56.** *Id.* §§ 1132(a)(1)(B), 1132(a)(3)(B).

**57.** The Court uses this phrase to refer to the J & H arrangements without determining that those arrangements were a covered ERISA plan.

**58.** Section 402(a), 29 U.S.C. § 1102(a), does require a written instrument. That section, however, does not apply to all ERISA plans by virtue of Section 401(a), 29 U.S.C. § 1101(a). Nor does the failure of an employer to comply with the writing requirement prevent the creation of an ERISA plan. *E.g., Donovan*, 688 F.2d at 1373; James F. Jorden, Waldemar J. Pflepsen, Jr, and Stephen H. Goldberg, Handbook on ERISA Litigation § 1.01[A], at 1–6 & nn. 23–25 (2d ed.1996).

**59.** *See Grimo v. Blue Cross/Blue Shield of Vt.,* 34 F.3d 148, 151 (2d Cir.1994); *Carver v. Westinghouse Hanford Co.,* 951 F.2d 1083, 1086 (9th Cir.1991), *cert. denied,* 505 U.S. 1222, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992); *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982) (*in banc* ).

plan is treated as a unilateral contract offer that is accepted upon retirement, at which point it becomes irrevocable.[60] At that point, the sponsor's ability to amend as to those who have retired prior to any given amendment depends upon the clarity with which the plan reserves that right.[61] Other ERISA plans are governed by ERISA's vesting provisions, which prohibit decrease of "[t]he accrued benefit of a participant" by amendment and render nonforfeitable "an employee's right to his normal retirement benefit ... upon the attainment of normal retirement age ..."[62]

■ Here it is unclear whether the J & H plan is an ERISA plan to begin with, whether it is a top hat plan, and whether the charter provisions relied upon are parts of it. The parties have not briefed the question whether the amendment of the plan, if plan amendment it was, would run afoul of the vesting provisions. Accordingly, the Court cannot dismiss the ERISA claim on the ground that the charter provisions, even if part of a covered plan, could be amended as they were consistently with the statute.

#### C. Aider and Abettor Liability

Finally, Marsh contends that the ERISA claims against it must be dismissed because it allegedly is liable only for aiding and abetting the other defendants' alleged ERISA violations. There is no aider and abettor liability, it contends, under this statute.

In *Diduck v. Kaszycki & Sons Contractors, Inc.*,[63] the Second Circuit held that a non-fiduciary may be held liable under

ERISA for knowing participation in a fiduciary's breach of duty. In *Mertens v. Hewitt Associates*,[64] however, the Supreme Court expressed strong reservations as to whether such a holding could be reconciled with the lack of any reference to relief against non-fiduciaries in the remedial sections of the statute.[65] At least two circuits subsequently have held that there is no cause of action under ERISA for participation by a non-fiduciary in a fiduciary breach.[66] Our own circuit, although it has not explicitly overruled *Diduck*, has stated that ERISA "appears to reflect a deliberate decision not to create remedies against nonfiduciaries."[67]

■ The Court is persuaded that *Diduck* no longer is authoritative in view of the considered contrary *dicta* by the Supreme Court in *Mertens* and our circuit's own recent comments. Accordingly, Marsh is entitled to dismissal of the ERISA claims against it.

### III. Federal Securities Claims

#### A. Are the Ten Year Certificates Securities?

The corporate defendants contend that the Ten Year Certificates that the plaintiffs sold to Marsh were not securities within the meaning of the Exchange Act.

The certificates were short letters in which each plaintiff recited that he sold his J & H shares to J & H in exchange for J & H's agreement to pay the "shadow dividends" which the complaint describes and agreed further that the plaintiff would forfeit his right to any further payments in

---

**60.** *Kemmerer v. ICI Americas*, 70 F.3d 281, 287 (3d Cir.1995), *cert. denied*, 517 U.S. 1209, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996).

**61.** *Senior Exec. Ben. Plan Parts. v. New Valley Corp. (In re New Valley Corp.)*, 89 F.3d 143, 151 (3d Cir.1996), *cert. denied*, 519 U.S. 1110, 117 S.Ct. 947, 136 L.Ed.2d 835 (1997); *Kemmerer*, 70 F.3d at 287–88.

**62.** 29 U.S.C. §§ 1054(g)(1), 1053(a).

**63.** 974 F.2d 270 (2d Cir.1992).

**64.** 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993).

**65.** *Id.* at 253–54, 113 S.Ct. 2063.

**66.** *Reich v. Continental Cas. Co.*, 33 F.3d 754, 757 (7th Cir.1994), *cert. denied*, 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995); *Reich v. Rowe*, 20 F.3d 25, 31 (1st Cir.1994).

**67.** *Strom*, —— F.3d at ——, 1999 WL 639844, at *9.

the event he breached the terms of the non-compete/consulting agreement the plaintiff signed the same day. Each was accepted and agreed by J & H. In substance, then, each agreement was an installment payment contract for the sale of stock that contained a forfeiture clause.

The only term in the Exchange Act's definition of "security" into which the Ten Year Certificates readily fit is "evidence of indebtedness." [68] That term, however, is not given its literal meaning, as to do so would render many commercial transactions subject to the securities laws. [69] The Court assumes without deciding, moreover, that the family resemblance test established in *Reves v. Ernst & Young* [70] would exclude them from that category. Nevertheless, the question remains whether they were "investment contract[s]" within the meaning of the Act and therefore securities.

■ The investment contract issue is governed by the now familiar standard of *SEC v. W.J. Howey Co*—an investment contract is a contract, transaction or scheme "involv[ing] an investment of money in a common enterprise with profits to come solely from the efforts of others." [71] Plaintiffs' transfer of their shares to J & H readily may be characterized as an investment. [72] J & H itself surely was a common enterprise from which plaintiffs were led to expect profits. While *Howey* did speak in terms of a requirement that the expected profits be derived "solely" from the efforts of others, it is reasonably clear that the test is met if the investor's prospective

returns depended principally on the essential managerial efforts of others, [73] as undeniably was true here given plaintiffs' retirement. In consequence, it is far from clear that plaintiffs cannot establish every element of the *Howey* test.

■ Finally, the corporate defendants argue that the Ten Year Certificates were not securities because they were personal service contracts. But they appear to mischaracterize the certificates and in any case seek to extend a generally unobjectionable principle *ad absurdum*.

The characterization of the certificates as personal service contracts, at least on a Rule 12 motion, is inappropriate. They were, in form, simple contracts in which the plaintiffs sold their common stock in J & H for streams of installment payments, the measure of which was J & H's future dividend stream. The contracts provided also, as noted above, that a plaintiff who breached the terms of his consulting or non-compete agreement would forfeit the right to future installment payments. But it is far from clear that the plaintiffs actually were expected to or ever did perform any personal services. The consulting aspect of the arrangements may have been included simply to buttress the enforceability of the non-compete clauses. In any case, evidence might show that the dominant consideration for the installment payments was not the agreements to consult, but the surrender of the plaintiffs' J & H shares. Accordingly, it is premature at best to conclude that the certificates were personal service contracts.

68. *See* 15 U.S.C. § 78c(10).

69. *See* II Louis Loss & Joel Seligman, Securities Regulation 962–64 (3d ed. rev.1999) (hereinafter Loss & Seligman).

70. 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990).

71. 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

72. *See Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); II Loss & Seligman 988.

Defendants rightly point to the possibility that the Ten Year Certificates were part of a pension plan as potentially bearing on whether they are securities within the meaning of the Exchange Act. *See Daniels*, 439 U.S. at 559–61, 99 S.Ct. 790. But it cannot now be said with certainty that the certificates were part of such a plan.

73. *SEC v. Aqua–Sonic Prods. Corp.*, 687 F.2d 577 (2d Cir.), *cert. denied sub nom. Hecht v. SEC*, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982); II Loss & Seligman 1003–04.

Moreover, it is far from clear that one who obtains an instrument which in all other respects is a security deprives the instrument of that character by including personal services in the consideration given in exchange for it. It would be strange doctrine indeed to conclude that a share of common stock of General Motors, identical to all other such shares, would lose its character as a security simply because the holder acquired it in exchange for personal labor.

### B. Loss Causation

■■■■ In this Circuit, a Rule 10b–5 plaintiff must establish both transaction and loss causation.[74] Transaction causation is established by "allegations and proof that the transaction in question would not have occurred 'but for' the misstatement." [75] Loss causation, on the other hand, requires proof of "a 'direct and proximate relationship between the loss and the misrepresentation,'" and it may not be supplied by "but for" allegations.[76] It is at least analogous to proximate cause.[77]

Here, defendants do not seriously question the sufficiency of plaintiffs' allegations of transaction causation, but argue that they have not adequately pleaded loss causation. They contend that the harm of which plaintiffs complain is the receipt of a disproportionately small share of the aggregate consideration paid by Marsh for J & H and that there is insufficient connection between that alleged loss and the alleged Rule 10b–5 violations.[78] Plaintiffs,

they say, had no choice but to accept or reject Marsh's offer—even disclosure of everything they say was concealed would not have avoided the loss. More specifically, they contend that plaintiffs have not alleged that disclosure of all they say was concealed would have led them to seek legal redress or, had they done so, that they would have succeeded and that their success would have produced an improved financial result.[79] But defendants ask too much on a Rule 12 motion.

■■■■ It is true of course that the federal securities laws do not reach corporate mismanagement in and of itself.[80] But the fraudulent concealment, in connection with a securities transaction, of facts regarding breach of fiduciary duty and corporate mismanagement may be actionable. A plaintiff who proves that he or she would have prevented the loss complained of through litigation had the operative facts been disclosed satisfies the loss causation requirement.[81]

■■■■ Defendants seize upon the requirement of proof that the loss would have been avoided to attack the sufficiency of the complaint, arguing that plaintiffs allege that they might—rather than would—have sued and prevailed had they known all of the facts allegedly concealed. But the standard of proof applicable at trial is not so readily transformed into a pleading requirement. All that is required now is allegations sufficient to permit proof at trial of the facts essential to recovery.[82] As this complaint contains more

---

**74.** E.g., Wilson v. Ruffa & Hanover, P.C., 844 F.2d 81, 86 (2d Cir.1988), vacated on reargument and aff'd, 872 F.2d 1124 (2d Cir.1989).

**75.** Id.

**76.** Id. (quoting Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 61 (2d Cir.1985)).

**77.** See Weiss v. Wittcoff, 966 F.2d 109, 111 (2d Cir.1992); Manufacturers Hanover Trust Co. v. Drysdale Securities Corp., 801 F.2d 13, 20–21 (2d Cir.1986), cert. denied, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); see also Moore v. Painewebber, Inc., 189 F.3d 165,

173–79 (2d Cir.1999) (Calabresi, J., concurring) (RICO case).

**78.** Ind. Def. Mem. 38–39; Corp. Def. Mem. 31–33.

**79.** Corp. Def. Mem. 32.

**80.** Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

**81.** See, e.g., Madison Consultants v. FDIC, 710 F.2d 57, 62–64 & n. 5 (2d Cir.1983).

**82.** Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

than enough to permit plaintiffs to adduce evidence that they would have sued and that such a suit would have yielded a better economic result, it sufficiently alleges loss causation.[83]

### C. "In Connection With"

The individual defendants contend that plaintiffs' securities law claim is insufficient because the alleged fraud did not concern the value of the securities they sold or the consideration they received in return.[84] They rely principally on a statement to that effect in *Chemical Bank v. Arthur Andersen & Co.*[85] Plaintiffs rejoin, in conclusory fashion, that the standard is satisfied here.

There is no suggestion here that plaintiffs were misled as to the value of the cash and Marsh stock they received. They certainly were aware also of the rights they possessed by virtue of their ownership of the Ten Year Certificates. If they were misled at all, they were misled principally about the manner in which (1) Marsh's aggregate purchase price had been determined and then allocated among J & H recipients, and (2) the individual defendants obtained J & H board approval for the transaction. The question is whether that is sufficient.

As the Second Circuit and commentators have said, the "in connection with" requirement has undergone considerable metamorphosis over the years.[86] At the most basic level, it "requires a nexus between the fraud and the purchase or sale of securities ..."[87] Nevertheless, its scope, particularly in atypical cases, remains unclear.[88] Moreover, the Second Circuit subsequently has limited the *Chemical Bank* passage on which defendants rely.

In *SEC v. Drysdale Securities Corp.*,[89] the issue was whether deception as to the financial condition of a brokerage house that "directly related to its ability to carry out obligations under agreements calling for the repurchase or resale of government securities"[90] was "in connection with" the purchase and sale of the securities. Although there concededly was no fraud as to the value of the government securities themselves, the Circuit nevertheless held that the alleged misrepresentations and omissions were actionable because the misrepresentations "involve[d] the consideration for a securities transaction" and the brokerage firm's financial position was important to its ability to perform under the repos and therefore "directly affect[ed] the transaction in securities."[91] It distin-

---

83. *See Mayer v. Oil Field Systems Corp.*, 721 F.2d 59, 67 (2d Cir.1983) (Rule 12(b)(6) dismissal reversed where defendants failed to establish that plaintiff would not have prevailed in litigation and thereby improved his position despite fact that plaintiff's allegations were "vague and perhaps induc[ed] scepticism").

This of course is not to say that plaintiffs necessarily are likely to prevail on this point at trial or, indeed, even on summary judgment. Defendants' factual argument— that plaintiffs had no real leverage and that blocking the transaction in court might simply have killed rather than improved the deal—cannot be rejected out of hand. Nor is it clear that plaintiffs necessarily would have prevailed had they sued.

84. Ind. Def. Mem. 35–37.

85. 726 F.2d 930, 943 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984).

86. *E.g., Steiner v. Ames Department Stores, Inc.*, 991 F.2d 953, 964, 966–67 (2d Cir.1993); C. Edward Fletcher, III, *The "In Connection With" Requirement of Rule 10b–5*, 16 Pepp. L.Rev. 913, 915, 922–29 (1989); Barbara Black, *Commentary: The Second Circuit's Approach to the 'In Connection With' Requirement of Rule 10b–5*, 53 Bklyn. L.Rev. 539 (1987).

87. Fletcher, 16 Pepp. L.Rev. at 920.

88. *Supra* note 86.

89. 785 F.2d 38 (2d Cir.1986).

90. *Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843, 847 (2d Cir.1986).

91. *Drysdale Securities Corp.*, 785 F.2d at 41–42.

guished *Chemical Bank* on the ground that the securities transactions there at issue were entirely incidental to a commercial transaction.[92] Indeed, in a subsequent case, the Circuit, albeit in *dictum*, has read *Chemical Bank* and *Drysdale Securities* as together standing for the proposition that "[t]o fall within Section 10(b), misrepresentations must have some direct pertinence to a securities transaction." [93]

■ It is unnecessary here to probe the outer limits of the "in connection with" requirement. While the plaintiffs certainly knew how their future income streams from the Ten Year Certificates would be determined if ·they held, the value of the certificates was unknown. The certificates were not, for example, traded in an active, impersonal market to which plaintiffs could refer. Hence, when the individual defendants allegedly deceived plaintiffs into believing that the price offered to them was determined by Marsh after negotiations in which the individual defendants assiduously protected plaintiffs' interests, when in fact that price was what the self-interested individual defendants were prepared to allot to plaintiffs out of the aggregate price they negotiated with Marsh, they arguably deceived plaintiffs as to the value of the Ten Year Certificates. It is no stretch to say that such a deception, if it occurred, was "in connection with" the sale of those instruments.

■ This conclusion is supported by the long standing proposition that a sale of securities by a broker-dealer at an excessive markup violates Rule 10b–5.[94] In such cases, the buyer knows precisely both what it pays and what it gets. Yet the rule is violated because the broker deceives the buyer as to the relationship between the price charged and the market price. Plaintiffs' claim here is quite analogous.

### D. Justifiable Reliance

All defendants argue that plaintiffs have not alleged justifiable reliance on the alleged omissions. This contention is readily disposed of.

■ Where, as here, material omissions are alleged, plaintiffs are entitled to a presumption of reliance.[95] While certain of the facts allegedly concealed were matters of public record,[96] neither the complaint nor the other documents properly considered on this motion indicate that all actually or constructively were known by plaintiffs.[97] Moreover, it is far from clear at this early juncture that plaintiffs could prove no facts justifying their reliance even as to matters that were disclosed in the Stock Purchase Agreement.

■ "An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." [98] Nev-

92. *Id.* at 41.

93. *Rand,* 794 F.2d at 847.

94. *E.g., Grandon v. Merrill Lynch and Co.,* 147 F.3d 184, 189 (2d Cir.1998); *Manela v. Garantia Banking Ltd.,* 5 F.Supp.2d 165, 175–76 (S.D.N.Y.1998); VIII Loss & SELIGMAN 3778; *see Charles Hughes & Co. v. SEC,* 139 F.2d 434, 436–38 (2d Cir.1943), *cert. denied.* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944).

95. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

96. The Stock Purchase Agreement between Marsh and J & H was an exhibit to Marsh's Current Report on Form 8–K, which was filed with the SEC several days before the March

19, 1997 meeting. Schnabl Decl. Ex. E. Some of the allegedly concealed facts—including the need for and fact of the amendment of the J & H Certificate of Incorporation and By-laws, the division of the aggregate purchase price between the incumbent directors and the retirees, and the obligation of the incumbent directors to seek the agreement of the retirees—would have been readily apparent to any reader.

97. Indeed, the individual defendants so conceded at the outset, asserting only that "several of the alleged omissions was [*sic* ] easily discernable" from the available information. Ind. Def. Mem. 32.

98. *Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1032 (2d Cir.1993) (citing *Royal Am. Mgrs., Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1015–16 (2d Cir.1989)).

ertheless, whether reliance is justified in a particular case requires consideration of a number of factors including:

"(1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction; and (8) the generality or specificity of the misrepresentations." [99]

Here, the level of the plaintiffs' sophistication and expertise is disputed, Plaintiffs allege longstanding business and personal relationships with the individual defendants, J & H and its counsel that are pertinent to the reasonableness of their apparent failure to review the Stock Purchase Agreement filed by Marsh prior to selling their Ten Year Certificates. Indeed, Judge Sand only recently referred in a related context to the unique culture of J & H.[100] Plaintiffs did not initiate the transaction, and the individual defendants allegedly owed them a fiduciary duty. While the reasonableness of reliance occasionally may be determined as a matter of law,[101] this is not such a case, at least on a motion addressed to the complaint.[102]

**99.** *Id.*

**100.** *EEOC v. Johnson & Higgins*, 5 F.Supp.2d 181, 186–87 (S.D.N.Y.1998).

**101.** *See Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978) (affirming summary judgment *determining that reliance was un-justified*).

**102.** *See Manela*, 5 F.Supp.2d at 176–77.

**103.** Ind. Def. Mem. 26–29.

**104.** *Schnell v. Chris–Craft Industries, Inc.*, 285 A.2d 437, 439 (Del.Sup.1971).

**105.** Directors' fiduciary duties, while normally owed only to holders of equity securities, are not invariably so limited. *See, e.g., Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 787–88 (Del.Ch.1992) (fiduciary duty owed to creditors of insolvent corporation) (Delaware law); *In re Livingston & Co.*, 186 B.R. 841,

### E. Materiality

All defendants contend that the alleged omissions were not material.

Plaintiffs knew how much they would receive if they sold and how much they would receive if they did not. In consequence, defendants argue, plaintiffs had all the information necessary to their decision. In addition, they contend that the undisclosed information was not material because plaintiffs could not have stopped the transaction in court and had no right to vote on whether to amend the charter and by-laws.[103]

 Defendants' position is simply a reprise of the loss causation argument. Plaintiffs may be unable to prove that they would have achieved a better outcome if the facts all had been disclosed. But that cannot be determined now. Moreover, the fact that the plaintiffs were not entitled to vote on whether to amend J & H's charter and by-laws is not dispositive of whether they could have prevailed on a claim that the incumbent directors' action in doing so was improper. "[I]nequitable action [by corporate directors] does not become permissible simply because it is legally possible." [104] As the directors here manifestly were self-interested—the amendment of the charter and by-laws was necessary to enable them to sell their own shares for huge profits—and at least arguably owed a fiduciary duty to the plaintiffs,[105] defen-

869 (D.N.J.1995) (same) (New Jersey law); *cf. Credit Lyonnais Bank Nederland N.V. v. Pathe Comm. Corp.*, Civ. Action No. 12150, 1991 WL 277613, at *34 (Del. Ch. Dec. 30, 1991) (directors owe fiduciary duty to corporate enterprise in the zone of insolvency). Plaintiffs' unusual interests in J & H may have been sufficiently similar to the interests of common stockholders as to warrant the conclusion that the directors' fiduciary duties extended to them as well. In any case, it is well established under New Jersey law, which probably controls on this point, that a fiduciary relationship arises between two persons when a person reposes trust and confidence in another who is in a dominant and controlling position. *E.g., F.G. v. MacDonell*, 150 N.J. 550, 563, 696 A.2d 697, 703 (1997); *see* GEORGE G. BOGERT & GEORGE T. BOGERT, TRUSTS AND TRUSTEES 2D § 481 (1978) ("exact limits of ... term 'fiduciary relation' ... impossible of statement"). Plaintiffs' allegations arguably

dants have failed to establish that plaintiffs could not have improved their lot through litigation if all of the facts had been disclosed. In consequence, their materiality argument cannot now be accepted.

### F. Particularity of the Fraud Allegations

All defendants argue that the complaint fails to allege fraud with particularity. The corporate defendants contend that the complaint fails to allege any basis for supposing that J & H or Marsh acted with the requisite *scienter*.[106] The individual defendants assert that the allegation that they falsely promised the plaintiffs that they would receive a 60/40 split of the Surplus Cash could not have been made.

██ The individual defendants' argument is frivolous. While it seems quite unlikely, for all of the reasons cited in their memorandum, that the individual defendants would have promised a 60/40 split of the Surplus Cash, the fact remains that the complaint alleges that the promise was made. The Court is obliged so to assume.

██ J & H's contention also is without merit. Plaintiffs adequately allege that J & H personnel fraudulently omitted at the March 19, 1997 meeting to state material facts necessary to make that which was stated not misleading. J & H may be held liable for those actions on a *respondeat superior* basis.[107] Indeed, J & H does not dispute this proposition in its reply brief.

██ Marsh's position is more substantial. The alleged fraud took place at the March 19, 1997 meeting.[108] The presentation at that meeting was made "by representatives of J & H, together with J & H Counsel."[109] The basis for the attempt to hold Marsh responsible for that presentation is the bald allegation that those making the presentation "were authorized to and did act on behalf of all defendants."[110] While Marsh clearly had a motive to induce the plaintiffs to sell their Ten Year Certificates, this conclusory allegation is insufficient to satisfy plaintiffs' obligations under the Private Securities Litigation Reform Act[111] and Rule 9(b).[112]

### IV. The Releases

The corporate defendants assert next that plaintiffs have released their claims by virtue of language contained in the agreements by which they sold their Ten Year Certificates to Marsh and other documents executed some months later in connection with the distribution of Surplus Cash under the SPA. But the contention is without merit for several reasons, two of which suffice for present purposes.

██ To begin with, the releases executed in connection with the distribution of the Surplus Cash are not referred to in the complaint, and the Court has declined to consider them on these motions in view of the impropriety of converting them into motions for summary judgment. In any case, those releases arguably were quite limited in scope and raise substantial issues of interpretation on their face. The releases executed in connection with the sale of the Ten Year Certificates are properly before the Court but are not conclusive because plaintiffs have asserted a legally sufficient claim for fraud in their inducement.

---

permit the conclusion that the relationship between the incumbent directors and the retirees was fiduciary in nature. *See EEOC v. Johnson & Higgins*, 5 F.Supp.2d at 186–87.

**106.** Corp. Def. Mem. 21.

**107.** *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.), *cert. denied sub nom. Wood Walker & Co. v. Marbury Management,* *Inc.*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980).

**108.** Cpt ¶¶ 92–98, 104–36.

**109.** *Id.* ¶ 104.

**110.** *Id.* ¶ 106.

**111.** 15 U.S.C. § 78u–4(b)(2).

**112.** FED. R. CIV. P. 9(b).

## V. The State Law Claims

Defendants attack the sufficiency of plaintiffs' state law claims against the possibility, now realized, that the Court would not dismiss them as preempted by ERISA. Their contentions are disposed of briefly.

The corporate defendants seek dismissal of the common law fraud claims on precisely the same grounds on which they moved to dismiss the federal securities law claims. This aspect of their motion is disposed of accordingly.

Plaintiffs tacitly have conceded that the breach of contract claim against J & H is insufficient because J & H's actions, whatever else may be said of them, were consistent with the agreements between J & H and plaintiffs. Accordingly, that claim must be dismissed.

The individual defendants' motion to dismiss the breach of fiduciary duty claim against them on the ground that plaintiffs were not equity stockholders and therefore were owed no fiduciary duty is at best premature for the reasons explained above.

Finally, the complaint is devoid of any factual allegations suggesting that Marsh knowingly assisted or induced any breach of fiduciary duty by the individual defendants or J & H.

### Conclusion

The motions of the individual defendants to dismiss are denied in all respects in both cases. The motions of defendant Johnson & Higgins to dismiss are granted with respect to Count VI in each case and denied in all other respects. The motions of defendant Marsh & McLennan Companies, Inc. to dismiss are granted with respect to Counts II, III, IV and VIII in each case and denied in all other respects. The dismissal of Counts II, III and IV is without prejudice to the service and filing, on or before October 25, 1999, of a consolidated amended complaint setting forth any additional factual basis for the assertion that Marsh is liable for participation in the alleged breaches of fiduciary duty and for any common law and federal securities fraud committed by others.

SO ORDERED.