G–I HOLDINGS, INC., Plaintiff,

v.

**BARON & BUDD; Frederick Baron; Russell Budd; Ness, Motley, Loadholt, Richardson & Poole; Ronald Motley; Joseph Rice; Weitz & Luxenberg; Perry Weitz and Robert Gordon, Defendants.**

**No. 01 Civ. 0216(RWS).**

United States District Court, S.D. New York.

July 17, 2002.

Friedman, Wang & Bleiberg, New York, NY (Peter N. Wang, of counsel), Cahill Gordon & Reindel, New York, NY (Thomas J. Kavaler, of counsel), Washington Legal Foundation, Amicus Curiae, Washington, DC (Daniel J. Popeo, Richard A. Samp, of counsel), Robert J. Randell, Amicus Curiae, New York, NY, for Plaintiff.

Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York, NY (Mark C. Zauderer, Jonathan D. Lupkin, of counsel), Manatt, Phelps & Phillips, Washington, DC (Abbe David Lowell, Pamela J. Marple, of counsel), for Baron & Budd, Frederick Baron and Russell Budd.

Storch Amini & Munves, New York, NY, for Ness, Motley, Loadholt, Richardson & Poole, Ronald Motley and Joseph Rice.

Morvillo, Abramowitz, Grand, Iason & Silberberg, New York, NY (Elkan Abramowitz, Lawrence S. Bader, Robert M. Radick, of counsel), for Weitz & Luxenberg, Perry Weitz & Robert Gordon.

## OPINION

SWEET, District Judge.

Defendant law firms Baron & Budd, Ness Motley, Loadholt, Richardson & Poole ("Ness Motley"), and Weitz & Luxenberg, and individual defendants Russell Budd ("Budd"), Frederick Baron ("Baron"), Ronald Motley ("Motley"), Joseph Rice ("Rice"), Perry Weitz ("Weitz") and Robert Gordon ("Gordon") (collectively, the "Defendants") have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing portions of the Third Amended Complaint of G–1 Holdings ("Holdings"). In addition, the Ness Motley defendants (the law firm and individual defendants Ness and Motley) have moved to strike certain allegations in the complaint.

For the following reasons, the Defendants' motion is granted in part and denied in part, and Ness Motley's motion is granted.

### Parties

Holdings is a New Jersey corporation and is a holding company that includes certain former asbestos manufacturers and is the successor by merger to GAF Corporation ("GAF"). Plaintiffs have initiated many thousands of tort actions against GAF Corporation and Holdings arising out of the manufacture of a product known as Calsilite, an insulation product containing asbestos.

. The Defendants are law firms and their principals. They have represented many of the plaintiffs in the asbestos litigation against Holdings.

### Prior Proceedings

This action was initiated by the filing of an action by Holdings against the Defendants on January 10, 2001, alleging violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). The First Amended Complaint (the "FAC") was filed on April 30, 2001 and alleged *inter alia* that the Defendants engaged in a scheme to inundate the judicial system, and Holdings, with hundreds of thousands of asbestos cases without regard to their merit, and in various illegal acts in connection with such litigation including suborning false testimony. The FAC contained ten counts and alleged that Defendants (1) maliciously interfered with GAF's right to

petition Congress (prima facie tort) (Claim I); (2) tortiously interfered with GAF's contracts and economic advantage (Claim II); (3) violated federal antitrust law (Claim III); (4) violated the RICO statute (Claims IV–VII); (5) breached contracts with GAF (Counts VIII, IX); and (6) fraudulently induced GAF to enter into contracts they never intended to honor (Count X). That complaint was dismissed in part on December 11, 2001, but leave was granted to replead.

In a Second Amended Complaint, filed on January 25, 2002, Holdings repled certain of its state law claims, asserted a cause of action against Baron & Budd for common law fraud, and amended the allegations with regard to its witness tampering theory. Defendants moved to dismiss the Second Amended Complaint and Weitz & Luxenberg moved to strike certain allegations in the complaint.

On March 18, 2002, however, Holdings filed a Third Amended Complaint (the "TAC" or the "Complaint") in which it added a common law fraud claim against Weitz & Luxenberg and amended two paragraphs of its mail and wire fraud allegations against the Baron & Budd defendants to identify five cases and asserted on information and belief that "the Baron & Budd Memorandum was used to create false product identification and testimony in the deposition of each of the plaintiffs who were deposed in these actions." Holdings also sought the Court's permission to file the Third Amended Complaint after it had already filed it.

At a hearing on April 17, 2002, leave to file the Third Amended Complaint was granted, and the Defendants' motions to dismiss the Second Amended Complaint and strike certain allegations were denied inasmuch as they no longer targeted the current complaint. The Defendants were then given leave to renew their motions with regard to the TAC.

On April 26, 2002, the Defendants moved to dismiss certain of the counts, and Weitz & Luxenberg moved to strike certain allegations in the Complaint.

The Complaint consists of thirteen counts. However, not all the Counts are at issue, as demonstrated below:

- **Count I** (prima facie tort against all Defendants): not in contention; Holdings included it for the purposes of appeal.

- **Count II** (tortious interference with economic advantage against all Defendants): in contention.

- **Count III** (tortious interference with contract against all Defendants): not in contention; the Defendants did not move against it.[1]

- **Count IV** (antitrust violations against all Defendants): not in contention; Holdings included it for the purposes of appeal.

- **Count V** (RICO mail and wire fraud against Baron & Budd): in contention.

- **Count VI** (RICO mail and wire fraud against individual defendants Baron and Budd): in contention.

- **Count VII** (RICO substantive violation of witness tampering against all Defendants): not in contention except as to the grounds for dismissal.

- **Count VIII** (RICO conspiracy against all Defendants): not in contention; Holdings included it for the purposes of appeal.

- **Count IX** (breach of contract against Weitz & Luxenberg): not in conten-

---

**1.** Defendants reserved the right to raise the issue of whether they induced a breach for the sole purpose of harming plaintiff, but do not argue it here.

tion; defendants did not move against it.

- *Count X* (breach of contract against Ness Motley): not in contention; defendants did not move against it.

- *Count XI* (fraudulent inducement against Weitz & Luxenberg and Ness Motley): in contention.

- *Count XII* (common law fraud against Baron & Budd): in contention.

- *Count XIII* (common law fraud against Weitz & Luxenberg): in contention.

In sum, of the thirteen Counts, only Counts II, V, VI, XI, XII, and XIII are in contention. In addition, Holdings seeks clarification for the grounds for dismissal of Count VII.

The motions were considered fully submitted on May 15, 2002, at which time oral argument was heard.

### The Factual Allegations of the Complaint

The Complaint adopts in great measure the factual allegations of the First Amended Complaint. These facts were described in greater detail in *G–I Holdings v. Baron & Budd,* 179 F.Supp.2d 233 (S.D.N.Y. 2001), familiarity with which is presumed. Therefore, this section will only detail the additions or alterations from the First Amended Complaint.

None of the facts set forth below represent findings by the Court. As befits a motion to dismiss under Rule 12(b)(6), the facts are assumed to be as alleged in the complaint for purposes of the instant motion.

### Specific Instances of Falsifications of Affidavits

Holdings alleges that Baron & Budd filed false affidavits in connection with asbestos litigation. In December 1995, paralegals at Baron & Budd working under the supervision of Melanie Oliver, a Baron & Budd supervisor ("Oliver"), were instructed to gather hundreds of affidavits from Baron & Budd clients for use against GAF and other asbestos defendants for trial and/or settlement purposes. Such affidavits were critical to establish liability against a particular defendant whether they were to be used for trial or settlement purposes.

Under Oliver's supervision, the paralegals gathered the affidavits and began to compile the results in a conference room at Baron & Budd. With their deadline looming, the paralegals realized that approximately 200 of the affidavits were missing necessary information, including: (1) the asbestos product to which the affiant had been exposed; (2) the work site(s) at which the affiant had been exposed/employed; and/or (3) the client's signature.

The paralegals reported these omissions to Oliver, who instructed that the affidavits be "fixed." None of the affidavits was returned to the affiant for completion, correction, review or signature. Instead, at Oliver's direction, the paralegals "filled in" the missing information themselves.

Missing product identification was added without reference to or knowledge of whether the client could truthfully testify that he had been exposed to a particular asbestos product. For example, where a client had failed to identify a particular asbestos product to which he had been exposed, the paralegals would attempt to research which of the manufacturer's products "might" have been used at the identified work site and then simply add that product to the affidavit. Where a client had failed to identify a work site, the paralegals would create that information using the client's social security printout (to identify employment history) and then would deduce an appropriate work site that would match the particular product

and the particular asbestos manufacturer. The paralegals also signed clients' names on the unsigned affidavits.

In each case, after a deficient affidavit was "fixed" by Baron & Budd's paralegals, it was filed with the court in which the case was pending or was submitted to the defendants to support a settlement. Holdings claims the affidavits were false and fraudulent and were known by Baron & Budd to be so when they were filed or submitted.

Following their falsification by Baron & Budd, all or substantially all of the affidavits included identification of Ruberoid (plaintiff's predecessor by merger) as a manufacturer of asbestos products to which the affiant was exposed. Holdings claims these identifications were false and fraudulent.

GAF, through its agent, the Center for Claims Resolution ("CCR"), relied upon these false and fraudulent identifications in settling the cases and in allocating portions of the settlement to GAF.

Based on settlement date, trial location, and other salient characteristics, Holdings claims on information and belief that the universe of settlements in which these 200 or so false and fraudulent affidavits were submitted is contained within the list of 190 cases listed in an exhibit to the Complaint. The amount that GAF was defrauded into paying in these cases is a substantial portion of the $891,663 it paid to settle these cases.

Until January 16, 2002, Holdings claims that plaintiff was not, and in the exercise of reasonable diligence could not have been, aware of the specific instances alleged above because (1) the nature of the fraud was self-concealing; (2) the volume of litigation by Defendants made individualized investigation into the merits of each case an impossibility; and (3) Baron &

Budd took active steps to hinder GAF's investigation into Baron & Budd's ongoing fraud by, *inter alia*, interfering with GAF's ability to locate and interview former Baron & Budd employees. GAF has spent millions of dollars since the revelation of the Baron & Budd memorandum investigating Baron & Budd's misdeeds and seeking to identify the pattern of fraud and specific instances thereof.

### The Effects of the Routine Falsification of Product Identification Evidence

The falsification of product identification was not limited to the events of December 1995 described above. Claim forms filed by the Baron & Budd bankruptcy department also included false product identifications provided by a Baron & Budd employee. A paralegal working under the supervision of Baron & Budd bankruptcy department manager Tiffany Tuggle ("Tuggle") routinely listed products on claim forms for clients that had never been identified by the client or were wholly inconsistent with the information that had been provided by the client. Baron & Budd was made aware of this practice and did nothing to stop it. In fact, the paralegal was promoted.

### Backdating Claims and Falsifying Court Records

Subsequent to the filing of the Second Amended Complaint, Holdings claims to have uncovered additional evidence of wrongdoing by defendant Weitz & Luxenberg. The following eleven paragraphs are alleged on information and belief based on the investigation of private investigators working for Holdings.

In order to pursue claims against asbestos defendants that would otherwise be time-barred, Weitz & Luxenberg has backdated documents filed in asbestos personal injury cases and tampered with and falsified records of the Supreme Court of the State of New York.

In the spring of 2000, Weitz & Luxenberg maintained an office at 120 Wall Street in Manhattan that oversaw the prosecution of asbestos personal injury cases on behalf of clients who had died. In May 2000, Weitz & Luxenberg attorneys recognized that they had failed to amend in a timely fashion a complaint filed in New York County, the effect of which was to bar claims against one or more named or unnamed defendants under applicable statutes of limitations. Weitz & Luxenberg remedied the problem by backdating the amended pleading, falsifying the filing stamp and altering the books and records of the New York County Supreme Court to reflect the fact that the amendment had been filed long before it actually was filed.

Pleadings filed in the New York County Supreme Court all bear an official court stamp, affixed by court employees, reflecting the date upon which the pleading was filed in the County Clerk's office (the "Filed Stamp"). The filing date, reflected in the Filed Stamp, is relied upon by both the Court and by litigants (including GAF) in calculating the timeliness of the filing. In the spring of 2000, GAF was a named defendant in all, or substantially all, of the asbestos liability actions brought in New York County by Weitz & Luxenberg on behalf of its clients.

Sometime after Weitz & Luxenberg attorneys discovered the error, Weitz & Luxenberg personnel, acting under the direction of Weitz & Luxenberg attorney Marie Ochigrassi ("Ochigrassi"), undertook to ensure that the amended complaint would be filed with a false backdated Filed Stamp and that the court's records would be falsely altered to reflect that the pleading had been filed before it actually was filed. Ochigrassi was the head of a department comprised of two other attorneys and paralegals. The two supervising paralegals in the department were Alicia Ostracher and Vanessa Ostracher, both of whom are daughters of Elba Aguilar ("Aguilar").

Aguilar is and was at that time a court employee at the New York County Supreme Court building at 60 Centre Street in Manhattan. Aguilar's duties at the courthouse are such that she has and at all relevant times had access to the New York County Clerk's Filed Stamp and New York County Supreme Court case records.

Aguilar is the mother of three present or former Weitz & Luxenberg paralegals: the Ostrachers and Mary Jo Sci. In addition, Weitz & Luxenberg is representing Aguilar's former husband (with whom she is now reconciled) in litigation with Nassau County in which Aguilar's interests appear to be aligned with his. Weitz & Luxenberg is handling the litigation at no charge.

Under the direction of Ochigrassi, Weitz & Luxenberg personnel first prepared a back-dated amended complaint. When the new papers were ready, Ochigrassi summoned a paralegal to her office where paralegal Alicia Ostracher was also waiting. Ochigrassi instructed the paralegal that he was "to take something down to Alicia's mother" and "to follow Alicia's instructions." Ostracher handed the paralegal an envelope containing the amended complaint and indicated that she had called her mother who would be waiting to meet him at 60 Centre Street.

Ostracher instructed the paralegal to meet her mother inside the entrance to the courthouse at 60 Centre Street. When the paralegal arrived, Aguilar told him to go downstairs to the records department of the courthouse ahead of her, to make a copy of the document he had brought with him and to fill out a request form for the case file. He did so. As he was being handed the case file, Aguilar appeared by

his side and showed the filing clerk her badge so that the file could be removed from the clerk's view. Aguilar also requested a document log book for a certain time period, which the clerk gave her.

Aguilar and the paralegal took the file, the logbook, and the documents to a space near the copy machine. Aguilar stamped the amended complaint with the court's Filed Stamp to reflect falsely that it had been filed at an earlier date, before the statute of limitations ran on the newly added claims. Aguilar then added a false entry to the court's log book. The entry Aguilar placed in the log book falsely indicated that the amended complaint had been filed on the false filing date. At Aguilar's instruction, the paralegal then took the case file to the copy machine, copied a document in it (so as to suggest that was the reason he had requested it) and then placed the falsely stamped pleading in the case file. The log book and case file were then returned to the filing clerk.

This was not an isolated incident. On several other occasions, the paralegal was instructed by Weitz & Luxenberg attorney Ochigrassi or Weitz & Luxenberg paralegal Ostracher to take blue-backed documents to Aguilar so that false Filed Stamps could be affixed on them. Once Aguilar took the paralegal upstairs at the courthouse at 60 Centre Street and made him wait on a bench. She then took the documents into another room and brought them back, all with back-dated Filed Stamps newly affixed. On another occasion, they met at the court's rotunda on the first floor. At that time, Aguilar simply ducked behind a column and quickly stamped the documents with the earlier, but false, filing dates. On yet another occasion, Aguilar met the paralegal outside the side entrance to 60 Centre Street to effectuate the falsification of filing stamps on case documents generated by Weitz &

Luxenberg. On every occasion, Aguilar took steps to ensure that her conduct was not being observed by others.

Under Rule 3025 of New York's Civil Practice Law & Rules, amended complaints must be served on each party to the action, including each named defendant, and each named defendant must serve and file a response thereto. Weitz & Luxenberg's filing of fraudulently time-barred claims increased the litigation costs for all defendants in those cases.

### The Producer Agreement

Prior to December 17, 1999, GAF had a valid, written contract with CCR known as the Producer Agreement Concerning Center for Claims Resolution (the "Producer Agreement"). The express purpose of the Producer Agreement was to "provide for the administration, defense, payment, and disposition of asbestos-related claims" for the benefit of its participating members. Under the terms of the Producer Agreement, CCR could only terminate its contract with GAF under certain conditions and subject to certain restrictions enumerated therein.

Pursuant to the terms of the Producer Agreement, GAF designated CCR as its sole agent to administer and arrange on its behalf for the evaluation, settlement, payment or defense of all asbestos-related claims against it. In this capacity, CCR investigated claims, tried cases, and negotiated settlements on behalf of all of its members, thereby substantially reducing GAF's transaction costs in the asbestos claim resolution process.

As lawyers who routinely negotiated such settlements with CCR on behalf of their asbestos liability clients, Defendants were aware of GAF's contract with CCR and the benefits GAF derived from the contract. As alleged in the FAC, Defendants intentionally caused CCR to expel

GAF in breach of the Producer Agreement, thereby deliberately and wrongfully interfering with GAF's ongoing economic and contractual relationship with CCR.

By causing CCR to expel GAF, Defendants maliciously and without justification carried out the extortionate threats made in Defendants' campaign to coerce GAF to cease its efforts to lobby Congress for passage of the Fairness in Asbestos Claims Act, depriving GAF of the ongoing benefits of CCR membership and causing GAF special damages and other injury.

From January 17, 2000 to January 5, 2001, GAF was forced to establish and fund a free-standing network of defense counsel and to litigate asbestos bodily injury cases on its own. These expenses exceed the sum of $20 million.

### Counts v. and VI

These counts allege mail and wire fraud in association with a number of claimants. In the first complaint, Holdings had not identified the cases in which the claimants were plaintiffs. The Complaint now asserts that the claimants were plaintiffs in five cases: *Beverly Jean Brown v. Keene Corp.*, No. 93–10952 (98th Judicial District Court of Travis Co., TX); *Jimmy Leon Smathers v. Owens–Corning Fiberglas Corp.*, No. 95–06329 (126th Judicial District Court of Travis Co., TX); *Kenneth Shirley v. Owens–Corning Fiberglas Corp.*, No. 95–10495 (250th Judicial District Court of Travis Co, TX); *C.J. English v. Owens–Corning Fiberglas Corp.*, No. 96–06308 (134th Judicial District Court of Dallas Co., TX); *Edwin Ray McCray v. Owens–Corning Fiberglas Corp.*, No. 95–3109 (28th Judicial District Court of Neuces Co., TX). Further, Holdings alleges that Baron & Budd submitted false and fraudulent affidavits, and that GAF justifiably and reasonably relied upon these false and fraudulent affidavits to its

detriment in the amount of several hundred thousand dollars.

### Count VII

Holdings has amended its pleading to allege specifically that Defendants intended to prevent GAF; Samuel J. Heyman, the former chairman and chief executive officer of GAF ("Heyman"); and other members of the Coalition for Asbestos Resolution from testifying before Congress in support of FACA, or to cause their testimony to be less favorable to Defendants.

Holdings has included specific examples of attempts by Defendants to intimidate, threaten, or corruptly persuade former asbestos producers with the intent of preventing their testimony before Congress and causing them to withhold their testimony from Congress. With respect to GAF and Heyman, Holdings now alleges that Defendants had actual knowledge that Heyman was expected to be a witness in Congressional hearings on FACA. The conduct alleged above was undertaken with the specific intent of causing Heyman not to appear or, if he did appear, to moderate his testimony to be less unfavorable to the Defendants. Further, with respect to the other former asbestos producers, Defendants actually and correctly believed that some of their number would be called (or would voluntarily appear) as witnesses in those hearings. The conduct alleged above was undertaken with the specific intent of causing these individuals not to appear or, if they did appear, to moderate their testimony to be less unfavorable to the Defendants.

### The Futures Agreement

Holdings now alleges that Ness Motley, Weitz & Luxenberg and the Affiliated Law Firms used the Futures Agreements and their explicit and implicit (but false and fraudulent) promises to perform thereunder to induce CCR's agreement to settle

**534**

some 50,000 pending asbestos cases for approximately $750 million.

## Discussion

### I. *Motion To Dismiss*

#### A. *Standard for a Motion to Dismiss*

■ In reviewing a motion to dismiss under Rule 12(b)(6), courts must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993) (*citing IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993)). Review must be limited to the complaint and documents attached or incorporated by reference thereto. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991). In this context, the Second Circuit has held that a complaint is deemed to "include . . . documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000). However, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114, 122 (S.D.N.Y.1988). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). A complaint may only be dismissed when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Allen v. WestPoint–Pepperell, Inc.*, 945

F.2d 40, 44 (2d Cir.1991); *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996).

#### B. *Count II: Tortious Interference with Economic Advantage May Be Pleaded in the Alternative*

■ In Count II of its First Amended Complaint, Holdings pled claims for both tortious interference with contract and tortious interference with prospective economic advantage, based on the existence of an alleged contractual relationship between GAF and the CCR. It was held that Holdings had adequately pleaded a claim for tortious interference with prospective contractual relations. *G–I Holdings*, 179 F.Supp.2d at 253–54. However, the claim for tortious interference with contract was dismissed as Holdings failed to satisfy the requirement that it plead the existence of a "valid, existing contract" between itself and the CCR. *Id.* at 252–53.

In the Complaint, Holdings has restated its claim for tortious interference with prospective economic advantage without change (Count II) and repleaded its previously dismissed claim for tortious interference with contract (Count III). With respect to the latter claim, Holdings no longer relies on the ill-defined "contractual relationship" referred to in its prior pleading, but identifies the specific contract with which the Defendants purportedly interfered, the Producer Agreement, by which GAF designated CCR to act as its agent in the "evaluation, settlement, payment or defense of all asbestos-related claims." Compl. ¶ 188. Defendants do not contest that this allegation cures the defect identified in the earlier opinion.

However, the Defendants argue that by sufficiently pleading Count III, Holdings has undermined its claim for interference with prospective economic advantage. To Defendants' argument that Count II is

duplicative of Count III,[2] Holdings states that Count II is merely a claim pleaded in the alternative as permitted under the Federal Rules.

Rule 8 of the Federal Rules of Civil Procedure states, in pertinent part, that:

A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.

Fed.R.Civ.P. 8(e)(2); *see also Aiena v. Olsen,* 69 F.Supp.2d 521, 531 (S.D.N.Y.1999) (permitting alternative pleading for ERISA claim made in the alternative to state law claims because plaintiff not bound by alternative allegations at motion to dismiss stage). New York law is also in accord. CPLR § 3014; *see also Raglan Realty Corp. v. Tudor Hotel Corp.,* 149 A.D.2d 373, 374, 540 N.Y.S.2d 240, 241 (1st Dep't 1989) (reversing dismissal in action for specific performance and fraud because plaintiff was allowed to plead alternative theories) (*citing Mitchell v. New York*

*Hosp.,* 61 N.Y.2d 208, 218, 473 N.Y.S.2d 148, 461 N.E.2d 285 (1984)).

In *Aiena,* for instance, the court permitted the plaintiffs to plead an ERISA claim in the alternative to their state law claims because "given the uncertainties concerning (a) whether the J & H arrangements were an ERISA plan and (b) the scope of ERISA preemption, it would be foolish to put all of one's eggs in either the ERISA or the state law basket." *Aiena,* 69 F.Supp.2d at 531. If plaintiffs rested solely on the ERISA plan, it could turn out that the plan was not, in fact an ERISA plan. *Id.* Similarly, if they relied only on the state law claims, it could be determined that the plan was an ERISA claim and therefore the state law claims were preempted. *Id.*

The instant claims present an analogous situation. Should the Defendants demonstrate that Holdings' contract with CCR was not fully enforceable or, assuming the validity of the contract, that there was no breach, the claim for tortious interference might fail. *Catskill Dev. L.L.C. v. Park Place Entertainment Corp.,* 144 F.Supp.2d 215, 232 (S.D.N.Y.) ("The New York Court of Appeals has made clear that an essential element of a claim for tortious interference of contract is the existence of an enforceable contract . . . .") (*citing NBT Bancorp Inc. v. Fleet/Norstar Fin. Group Inc.,* 87 N.Y.2d 614, 641 N.Y.S.2d 581, 585, 664 N.E.2d 492 (1996)), *vacated in part on other grounds,* 154 F.Supp.2d 696

---

**2.** Holdings alleges it was owed the same rights pursuant to the contractual relationship and to the Producer Agreement. *Compare* Compl. ¶ 181 (pursuant to contractual relationship, "CCR investigated claims, tried cases, and negotiated settlements on a bulk basis on behalf of all of its members") with Compl. ¶ 188 (pursuant to Producer Agreement, "CCR investigated claims, tried cases, and negotiated settlements on a bulk basis on behalf of all of its members"). In addition, the allegedly interfering behavior is the same.

*Compare* Compl. ¶ 182 ("defendants caused CCR to expel GAF") with Compl. ¶ 190 ("defendants intentionally caused CCR to expel GAF in breach of the Producer Agreement"). Finally, the damages are also the same. *Compare* Compl. ¶¶ 183–85 (damages include denial of CCR benefits, inability to settle cases and special damages of more than $20 million as the result of "establishing and funding a free-standing network of defense counsel and litigating asbestos bodily injury cases on its own") with Compl. ¶¶ 191–93 (same).

(S.D.N.Y.2001); *see also Guard–Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, 184, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980) (finding no liability under claim for tortious interference to "one whose actions have induced nonperformance of a contract deemed to be voidable and thus unenforceable"). In those circumstances, however, the alternative claim for tortious interference with economic advantage would be viable. *Catskill Dev.*, 144 F.Supp.2d at 232 (plaintiff did not state claim for tortious interference with contract because contracts relied upon were unenforceable yet plaintiff nonetheless stated claim for tortious interference with prospective business relations).

The Defendants have presented three cases that hold that tortious interference with contract and tortious interference with prospective economic advantage cannot be pled in the alternative. *See D'Andrea v. Rafla–Demetrious*, 3 F.Supp.2d 239 (E.D.N.Y.1996) (dismissing on summary judgment claim for tortious interference with prospective economic advantage as redundant of claim for tortious interference with contract because of existence of contract); *Stomper v. Chicago Transit Auth.*, 1997 WL 177844, at *4 (N.D.Ill. April 4, 1997) (dismissing claim for tortious interference with business relations under Illinois law because the existence of an employment contract rendered the claim "completely redundant" with one for tortious interference with contract); *Egrets Pointe Townhouses Property Owners Ass'n Inc. v. Fairfield Communities, Inc.*,

870 F.Supp. 110, 116 (D.S.C.1994) (under South Carolina law, existence of valid contract "precludes any recovery on a claim for interference with prospective contractual relations").

These cases are not controlling, however, and to follow their holdings would unfairly require Holdings to choose, at an early stage in the proceedings, which cause of action to base its claim.[3]

■ The Defendants also urge that Counts II and III cannot be "in the alternative" as they are not expressly labeled as such in the Complaint. However, Holdings "need not use particular words to plead in the alternative" as long as "it can be reasonably inferred that this is what [it was] doing." *Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir.), *cert. denied*, 531 U.S. 880, 121 S.Ct. 191, 148 L.Ed.2d 132 (2000); *see also Pair–A–Dice Acquisition Partners, Inc. v. Board of Trustees of the Galveston Wharves*, 185 F.Supp.2d 703, 708 n. 6 (S.D.Tex.2002) ("Although [plaintiff] fails to use the term 'promissory estoppel' to describe its theory of recovery . . . the Court assumes that [plaintiff intended to plead promissory estoppel as an alternative theory of recovery] and will consider the merit of such argument."); *Steel Warehouse of Wisconsin Inc. v. Caterpillar Inc.*, 1990 WL 304266, at *3 (N.D.Ill. Nov.13, 1990) (allowing leave to amend complaint to clarify alternative pleading because Rule 8(a) "does not state that a party must explicitly identify alternative pleadings, and the court will not dismiss plaintiff's complaint on that basis"). Holdings did not explicitly state

---

**3.** It is true that in *D'Andrea*, the court recognized that there was a material issue of fact as to the validity of the employment contract. However, it did not take its recognition of that fact into consideration when determining whether the tortious interference with prospective economic advantage claim should withstand summary judgment. Presumably,

if it had done so, the result might have been different. In addition, *D'Andrea* involved a motion for summary judgment, and the narrowing down of claims in that manner is more appropriate at the summary judgment stage, after parties have had the opportunity for necessary discovery.

that it was alleging Counts II and III in the alternative, but it may be reasonably inferred that it intended to do so.[4]

Defendants' motion to dismiss Count II is denied.[5]

### C. Counts V and VI—Holdings Sufficiently Alleges RICO Mail and Wire Fraud Claims

Counts V and VI state RICO mail and wire fraud claims against the law firm Baron & Budd (Count V) and the individual defendants Baron and Budd (Count VI).

■ At a minimum, a plaintiff attempting to state a cognizable claim under section 1962(c) must plead the following elements: (1) that the defendants (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate commerce. *Citadel Mgmt., Inc. v. Telesis Trust Inc.*, 123 F.Supp.2d 133, 154 (S.D.N.Y.2000) (*citing Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983)).

The Defendants[6] argue that Holdings has failed to allege adequately the existence of predicate acts, a pattern, an enterprise, and that it has standing.

### 1. Predicate Acts

In order to maintain a RICO claim, a plaintiff must allege that each defendant engaged in two or more predicate acts. *Citadel Mgmt.*, 123 F.Supp.2d at 155 (*citing Lakonia Mgmt., Ltd. v. Meriwether*, 106 F.Supp.2d 540, 550 (S.D.N.Y.2000); *Moeller v. Zaccaria*, 831 F.Supp. 1046, 1056 (S.D.N.Y.1993)).

The RICO counts in the First Amended Complaint were dismissed for failure to plead a predicate act with requisite specificity. Holdings alleged in its FAC that the Baron & Budd defendants falsified documents, affidavits, and depositions and then submitted them in a "substantial portion" of 900 Ohio cases identified in an exhibit to the complaint as well as in 31 cases named in the text of the FAC. It was found that the First Amended Complaint failed to allege adequately specific instances of fraudulent conduct to satisfy the Federal Rules with respect to the specific dates, times and contents of the fraudulent statements constituting mail and wire fraud:

> Because Holdings has not alleged which of the over 900 cases specifically refer-

---

**4.** The Defendants did not cite any authority to suggest the contrary. Several cases have found, however, that a reasonable inference may not be drawn in certain circumstances not applicable here. For instance, in *Samuels v. Old Kent Bank*, 1997 WL 458434, at *14–*15 (N.D.Ill., Aug.1, 1997), the court applied *Holman* and determined that a reasonable inference could not be drawn that the plaintiff had pleaded breach of contract and unjust enrichment in the alternative. Unjust enrichment may only be pleaded under the applicable state law, Illinois, in the absence of a valid contract. *Id.* The Complaint no where stated that the contract might not be valid, and the unjust enrichment count explicitly incorporated paragraphs alleging the existence of a valid contract. *Id.* Holdings' complaint does not

face the same internal inconsistencies as it alleges that there was a contractual relationship in addition to the existence of a valid contract.

**5.** The Defendants maintain their challenge to both Counts II and III on the basis that their supposed interference was not intended solely to harm GAF. Defendants do not reargue this point here, however, as they already did so unsuccessfully in their first motion to dismiss.

**6.** Because the claim is only advanced against the Baron & Budd defendants (the law firm and the individuals), all references to "Defendants" in this section are to the Baron & Budd defendants only.

enced in the Complaint (in which the Baron & Budd memorandum was used) included fraudulent product identifications and/or other false testimony, this claim must be dismissed.... Holdings has not pointed to a specific deposition, product identification, or affidavit from those cases that support its claims. Moreover, Holdings has held the Memorandum in its possession for over three years. A failure to specify any individual false statements and the dates and times they were transmitted is fatal to Holdings' claims.

*G–I Holdings,* 179 F.Supp.2d at 262.

Holdings has made two pertinent amendments since the dismissal. It has added (1) the names of cases that it claims on information and belief were affected by the "Baron & Budd Memorandum" and (2) allegations regarding the "fixing" of affidavits by paralegals. The Defendants state the changes still leave the Complaint impermissibly unspecific and, even if the amendments do satisfy Rule 9(b), the new allegations are time-barred and equitable tolling is not applicable.

### a. *Allegations Concerning the "Baron & Budd Memorandum" Continue To Lack Specificity*

Fed.R.Civ.P. 9(b) requires that in all allegations of fraud, the circumstances constituting fraud must be stated with particularity. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994). The rule is designed to further three goals: (1) providing defendants with fair notice of the claims against them; (2) protecting defendants from harm to their reputations or good will be unfounded allegations of fraud; and (3) reducing the number of strike suits. *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987).

The Second Circuit has made clear that "[i]n the RICO context, Rule 9(b) calls for the complaint to 'specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" *E.g., Moore v. PaineWebber, Inc.,* 189 F.3d 165, 173 (2d Cir.1999) (citations omitted); *see also Official Publications, Inc. v. Kable News Co.,* 692 F.Supp. 239, 245 (S.D.N.Y. 1988) (complaint alleging mail and wire fraud must "set forth the contents of the items mailed and specify how each of these items was false and misleading" and "must specify who made the allegedly fraudulent statements and the time and place such statements were made"), *rev'd on other grounds,* 884 F.2d 664 (2d Cir.1989); *Spoto v. Herkimer Co. Trust,* 2000 WL 533293, at *6 (N.D.N.Y. April 27, 2000) (dismissing RICO mail fraud claim because plaintiff failed to delineate "the who, what, why, where, and when" of the alleged misrepresentation).

Holdings realleges that the Defendants used the "Baron & Budd Memorandum," entitled "Preparing Your Deposition," to manufacture evidence and coach answers from clients. This claim was dismissed from the FAC for lack of specificity. 179 F.Supp.2d at 262.

In the FAC, Holdings listed 30 claimants who were "involved" with these allegations. The Complaint now states that the 30 claimants were plaintiffs in five cases and alleges that "[o]n information and belief, the Baron & Budd Memorandum was used to create false product identification testimony in the depositions of each of the plaintiffs who were deposed in these actions." Compl. ¶ 234.

Holdings' addition of new cases, without addressing the specific information

deemed necessary in the earlier opinion, is without effect. Holdings fails to allege which claimants were in which case, which claimants were actually deposed, and whether depositions were taken in the cases. In addition, Holdings still does not provide the date of a single deposition, the participating individuals, or the false identification made during the deposition. Importantly, it does not state that the deponents even viewed the Baron & Budd Memorandum.

GAF was involved as a party in those cases and depositions that it refers to in the amended allegations. 179 F.Supp.2d at 262. In addition, Holdings has had possession of the Memorandum for a number of years. As a result, Holdings must state this claim with much greater specificity than in the Complaint.

The additional allegations do not overcome the shortcomings outlined in the Opinion, and therefore Holdings' RICO mail and wire fraud claims based on the Baron & Budd Memorandum are dismissed.

### b. The "Fixed" Affidavits Constitute Predicate Acts

Holdings alleges that in December 1995, unnamed paralegals at Baron & Budd noticed that approximately 200 affidavits filed in unnamed asbestos cases against plaintiff and other asbestos defendants were missing necessary information. TAC ¶¶ 82, 90. Holdings alleges that Melanie Oliver, a Baron & Budd supervisor, instructed the paralegals to "fix" the affidavits. Holdings further claims that the paralegals added the product identification information to and signed the affidavits without consulting the affiants. These allegations were not included in the First Amended Complaint and therefore have not been previously discussed.

### i. The Allegations Are Sufficiently Specific

As discussed above, two rationales underlying Rule 9(b) are that pleadings should be sufficiently specific as to provide defendants with fair notice of the claims against them and protect them from harm to reputation or good will be unfounded allegations of fraud. Bearing these principles in mind, Holdings has cleared this hurdle—albeit just barely—with these particular allegations. The Defendants have notice of when the behavior is alleged to have taken place: in or around December 1995. The allegations are further specified by pointing to the particular supervisor under whose aegis the fraud is alleged to have taken place. Finally, Holdings has narrowed down a sea of potential cases to a smaller group of 200 cases, in which, as they note, it is highly probable that the alleged fraud was involved.

It is true, as Defendants point out, that Holdings does not refer to any specific affidavit or the specific information that was added to the affidavit. No specific product or work histories are mentioned, except that all or substantially all of them included identification of Ruberoid (Holdings' predecessor by merger) as a manufacturer of asbestos products to which the affiant was exposed.

In a typical case, it is true, such details would be mandatory. In the very fact-specific case before the court, it seems, such details are next to impossible to achieve at this stage of pleading. One of the very allegations underlying this Complaint is that the Defendants undertook to bury GAF and other asbestos producers with litigation so that they were unable to scrutinize each and every affidavit of each and every plaintiff in each and every complaint because it was financially ruinous to do so. Holdings is now attempting to do what it did not do before, a task requiring

as much effort—and with as little appeal—as cleansing the Augean stables.

Holdings has provided sufficient notice so that the Defendants may defend themselves. Further, the allegations are specific enough so that they are not mere shots in the dark in an attempt to hit a broad target.[7] Whether these allegations are borne out in the end, however, is another matter—but one for another day.

### ii. The Allegations Are Not Time–Barred

Because the "fixing" of the affidavits took place more than four years ago, Defendants assert that the allegations are barred by the four-year statute of limitations applicable to civil RICO actions. *In re Merrill Lynch Ltd. Partnerships Litig.*, 7 F.Supp.2d 256, 262 (S.D.N.Y.1997).

Holdings does not contest that the alleged injury was suffered more than four years ago, but argues that the statute of limitations should be tolled either by equitable estoppel or by fraudulent concealment. Holdings asserts that it could not have learned of the falsification of affidavits until January 2002[8] because (1) the nature of the fraud was self-concealing; (2) the volume of litigation fomented by Defendants made individualized investigation into the merits of each case an impossibility; and (3) Baron & Budd took active, aggressive, and effective steps to hinder GAF's investigation into Baron & Budd's ongoing fraud by, *inter alia*, seeking to interfere with GAF's ability to locate and interview former Baron & Budd employees.

The Second Circuit has held that the "standard tolling exceptions" apply to civil RICO actions. *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir.1988). "Under the doctrine of wrongful concealment, the statute of limitations will be tolled if the plaintiff proves three elements: (1) wrongful concealment by the defendant, (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery of the claim." *Butala v. Agashiwala*, 916 F.Supp. 314, 319 (S.D.N.Y.1996); *see also State of New York v. Hendrickson Bros. Inc.*, 840 F.2d 1065, 1083 (2d Cir.1988).

The Defendants first argue that Holdings' tolling claim fails as it lacks the specificity required by Rule 9(b). *Id.* at 319–20; *Glick v. Berk & Michaels, P.C.*, 1991 WL 152614, at *9–*10 (S.D.N.Y. July 26, 1991) (granting motion to dismiss for failure to allege equitable tolling on Rule 9(b) grounds). The third allegation, that the Defendants have somehow interfered with Holdings' ability to contact and interview employees was not pled with sufficient specificity. Holdings failed to allege what steps the Defendants took, when they took these steps, and which employees were the subject of these efforts. Without more information, the Defendants could not prepare a defense against that charge. In addition, the allegation that

---

**7.** The "fixing" allegations are distinguishable from the Baron & Budd Memorandum cases because of the time in which Holdings has had the requisite information. Holdings has known for years about the Baron & Budd memorandum, yet continues to plead unspecific allegations against Baron & Budd. By contrast, Holdings has only recently obtained the information regarding the alleged "fixing" and already has provided a more specific set of charges.

**8.** Holdings learned of the specific instances of falsification on January 16, 2002, when a witness being interviewed under the auspices of Special Master Fitzpatrick provided the information. Nine days later, Holdings employed those allegations in its Second Amended Complaint.

the nature of the fraud was self-concealing is insufficient by itself without more detail. However, the second reason is sufficiently specific: the deluge of litigation made it impossible to verify the merits of each and every case.

■■■ The Defendants also contend that Holdings has failed to allege the three elements of fraudulent concealment. They argue first that the first element of concealment[9] was lacking because the affidavits allegedly containing the misrepresentations were disclosed in connection with pending civil actions, and that "they were transmitted directly to GAF's agent." *G–I Holdings*, 179 F.Supp.2d at 261. While this argument on the surface has appeal, it ignores the recurring theme of this case. The affidavits were transmitted directly to GAF's agent amidst a host of other, similar affidavits. The act of providing the allegedly falsified affidavits in such a manner constitutes "concealment"—according to Holdings, the Defendants knew that it would be unlikely, and perhaps financially disastrous, for GAF or its agent to sift through all of the affidavits to determine their veracity.

■■■ The Defendants also challenge Holdings' showing of due diligence. A motion to dismiss on the basis of a plaintiff's failure to engage in due diligence cannot be granted unless the "undisputed facts" show a lack of reasonable diligence. *E.g., Nelson v. Stahl*, 173 F.Supp.2d 153, 166 (S.D.N.Y.2001) (rejecting defendants' argument that plaintiffs' claim was barred by statute of limitations because plaintiffs were on inquiry notice of the fraud "because the question of whether plaintiffs should have discovered fraud earlier than they did, and thus whether the action is timely, is a question for the trier of fact");

*Dietrich v. Bauer*, 76 F.Supp.2d 312, 346 (S.D.N.Y.1999) (whether plaintiff engaged in due diligence in pursuing claims could not be answered on motion to dismiss because pleading did not establish "undisputed facts" to show inquiry notice and a lack of reasonable diligence on plaintiff's part in discovering the fraud).

Defendants present two related arguments as to why the undisputed facts fall in their favor.

First, they argue that because GAF's agent, CCR, was actively involved in litigation in which the alleged fraudulent statements were made, Holdings could have pursued depositions, written interrogatories, and other similar tactics to ensure that the affidavits were correct. Holdings itself admits this fact. Compl. ¶ 188 (pursuant to the Producer Agreement, CCR "investigated claims, tried cases, and negotiated settlements" on behalf of its members); Opp. Mot. to Dismiss at 34 ("Any individualized claim could perhaps be defended."). While this may be the case, the Defendants are not persuasive in arguing that the decision by CCR not to investigate each claim and try each case was a business decision that prevents any reasonable reliance as a matter of law on sworn affidavits filed "[a]s a prerequisite to implementation of certain mass settlements." Compl. ¶ 76. After making the decision to settle, there was no perceived need to determine the verity of each and every affidavit. In fact, to do so would obviate the rationale behind the mass settlements. Thus, the mere fact that GAF, through its agent, *could* have investigated each and every claim does not in the situation presented here mean that it was un-

---

9. With respect to this element, "there are two general varieties": the "defendant may have taken affirmative steps to prevent the discovery of the plaintiff's injury, or the nature of the wrong itself may have been self-concealing." *Butala*, 916 F.Supp. at 319.

reasonable in relying on the affidavits at issue.

The Defendants' final argument with regard to Holdings' due diligence is somewhat more persuasive. They argue, in essence, that a party to litigation can never reasonably rely on its adversaries' statements—even if those statements are presented in sworn affidavits. Defendants, however, fail to cite any authority that holds that a party to litigation may not as a matter of law reasonably rely on deliberate untruths in a sworn affidavit.

The closest case cited by Defendants is *Delorean v. Cork Gully*, 118 B.R. 932, 943 (E.D.Mich.1990), in which the court stated that a party could not justifiably rely on a proposed affidavit, provided by the defendants with an introductory cover letter that clearly put the party on notice that facts in the affidavit needed to be confirmed as true. There was no such introductory cover letter here that would have put GAF on notice, and the affidavits were signed, rather than merely proposed. The other cases cited do not involve sworn affidavits, but rather (1) the advice of adversaries, *id.; Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir.1993) (stating it was "unreasonable for one to rely on the advice of an adversary's counsel ... when both parties are aware that adverse interests are being pursued"); (2) omissions of fact, *Phoenix Canada Oil Co. v. Texaco Inc.*, 749 F.Supp. 525, 530 (S.D.N.Y.1990) (stating that a party's neglect to inform its adversary "of a fact which may or may not have been useful ... in fashioning a response to [a] ... defense" cannot be the basis of a party's reasonable reliance claims); and (3) non-egregious adversarial conduct, *Lazich v. Vittoria & Parker*, 189 A.D.2d 753, 754, 592 N.Y.S.2d 418, 419 (2d Dep't 1993) (finding, in divorce case, that "all the statements and actions complained of were undertaken in the course of adversarial proceedings and were fully controverted").

In the absence of authority to the contrary, to hold that a party cannot as a matter of law rely on a sworn affidavit goes too far.

In certain fact-specific circumstances, of course, even sworn affidavits may not as a matter of law be reasonably relied upon. *Delorean* presents one such exception. Another was presented in *Shaw Steel Inc. v. Morris*, 240 B.R. 553, 555 (Bkrtcy. N.D.Ill.1999), where the court was faced with the question of whether a creditor's reliance on the misrepresentations of a debtor (a self-proclaimed "liar," "scoundrel," and "fraudster") regarding his financial condition was justifiable. Shaw Steel argued that it relied on the defendant's misrepresentations because they were in affidavits submitted under oath as part of the resolution of disputed litigation. *Id.* at 558. The court rejected this claim: "Shaw Steel does not cite to any case law standing for the proposition that a party may reasonably rely upon the affidavit of a known liar and cheat which, on its own admission, it distrusted, did not know to be true, and would not accept ('Not on your life.') without further investigation." *Id.; see also Friedgood v. Axelrod*, 593 F.Supp. 395, (S.D.N.Y.1984) (despite numerous inconsistencies in client's affidavit, attorney could reasonably rely on affidavit when it was supported by other sworn statements).

The exceptions here prove the rule. In the absence of some "red flag," such as an introductory letter to that effect or the fact that the affiant is a known "scoundrel," whether a party may reasonably rely on sworn affidavits presents a factual issue that cannot be determined at this stage of the proceedings.

The undisputed facts here do not present such an exception to the rule. The affidavits were not proffered during the

give-and-take of ongoing litigation, but in connection with settlement, as conditions precedent to the obligation of CCR (as GAF's agent) to fund the settlement. As discussed above, any attempt to conduct inquiries into the affidavits would defeat the purpose of settling, which was to staunch the ongoing defense expenditures. Furthermore, there is no evidence that GAF believed at the time CCR received the affidavits that the Defendants were liars and/or scoundrels.

For these reasons, it is inappropriate to dismiss the mail and wire fraud claim on the basis of whether Holdings acted reasonably in not verifying the accuracy of the affidavits prior to settling the cases. Therefore, Holdings has alleged predicate acts, and the claims will not be dismissed on this ground.

### 2. *Pattern of Racketeering Activity*

Holdings must allege a "pattern of racketeering activity" consisting of "at least two acts of racketeering activity" undertaken within ten years of each other. 18 U.S.C. § 1961(5). The pattern element of a RICO claim requires a showing of "continuity" plus "relationship." *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (quoting S.Rep. No. 91–617, p. 158 (1969)). The Defendants do not challenge the "relationship" aspect on this motion.

In *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court defined the "continuity" element as follows:

> Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept. . . . A party alleging

a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before the continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* at 241–42, 109 S.Ct. 2893. Later cases have further developed the concepts of closed- and open-ended continuity.

### a. *Closed–Ended Continuity*

In order to measure whether closed-ended continuity exists, the Second Circuit has stated that several factors may be considered, including, *inter alia:* "the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes." *GICC Capital Corp. v. Technology Fin. Group, Inc.*, 67 F.3d 463, 467 (2d Cir.1995) (citations omitted).

The length of time over which predicate acts occurred is an important factor and appears to be dispositive if the period of time is not sufficiently long. The Second Circuit has thus far only found closed-ended continuity where the conduct lasted for two years or more. *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir.2001); *see also GICC*, 67 F.3d at 467 (*citing Jacobson v. Cooper*, 882 F.2d 717 (2d Cir.1989) (predicate acts occurred over "a matter of years" from 1980 to 1988); *Metromedia v. Fugazy*, 983 F.2d 350 (2d Cir.1992) (upholding RICO verdict, despite erroneous jury instruction that "a few weeks or months" might constitute a substantial pe-

riod of time, because predicate acts occurred over two years); *Procter & Gamble Co. v. Big Apple Indus. Bldgs. Inc.*, 879 F.2d 10, 18 (2d Cir.1989) (concluding, prior to *H.J.*, that allegations of predicate acts occurring over "period of nearly two years" as part of five-part fraudulent scheme were sufficient to plead pattern of racketeering activity)).[10]

The duration of a pattern of racketeering activity is measured by the RICO predicate acts the defendants commit. *De Falco*, 244 F.3d at 321. The only predicate acts at issue here are the alleged falsification of affidavits in December 1995. The last of the 190 cases alleged to be involved in this scheme was settled in June 1996. As a result, the period of time over which the predicate acts took place is at most seven months. Closed-ended continuity cannot exist over such an abbreviated period of time. Therefore, Holdings must establish open-ended continuity.

### b. *Open–Ended Continuity*

 Unlike closed-ended continuity, open-ended continuity "does not require a substantial temporal showing." *Jordan (Bermuda) Inv. Co. v. Hunter Green Inv. Ltd.*, 154 F.Supp.2d 682, 694 (S.D.N.Y.2001) (citing *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir.1999)). Rather, it "requires a plaintiff to show a threat of ongoing criminal activity beyond the period in which the predicate acts were committed." *Id.*

 "In this Circuit, 'cases assessing whether a threat of continuity exists have looked first to the nature of the predicate acts alleged or to the nature of the enterprise at whose behest the predicate acts were performed.'" *DeFalco*, 244 F.3d at 323 (citing *GICC*, 67 F.3d at 466 (collecting cases)). Where, as here, the alleged enterprise "primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit*, 187 F.3d at 243; *see also H.J.*, 492 U.S. at 242–43, 109 S.Ct. 2893 (finding threat where it can be demonstrated that predicate acts are "a regular way of conducting defendant's ongoing legitimate business . . . or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'").

The nature of the predicate acts at issue imply a threat of on-going criminal activity. According to Holdings, unnamed paralegals were told to "fix" affidavits by a supervisor in order to meet a looming deadline, and they "fixed" them without the assistance or permission of the affiants. First, the alleged "fixing" involved 200 affidavits, rather than merely one or two or even a handful of affidavits. The sheer scope of the predicate acts ratchets up the seriousness and suggests a future threat. Second, a supervisor gave the instruction to "fix" the affidavits, suggesting that it was not merely the independent actions of paralegals who, in the future, may be advised to act differently. Instead, the management was involved. Finally, although perhaps the situation of finding 200 incomplete affidavits on the eve of their due date was quite extreme, the legal profession is in general inundated with deadlines. Further, the sort of asbestos litigation performed by Baron &

---

10. Holdings suggests that the Second Circuit found closed-ended continuity based on a pattern of predicate acts occurring over a period of one year in *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520–21 (2d Cir.1994). However, the Second Circuit in *GICC* cited *Azrielli* as a case in which open-ended continuity had been found. 67 F.3d at 466.

Budd involves, conservatively, hundreds of clients and thousands of documents. Another group of paralegals almost inevitably has been and will be faced with a similar situation, even if not of the same magnitude. Given the factors discussed above, there is a threat that the affidavits again will be "fixed."

In addition, Holdings alleges that these predicate acts were performed as part of Baron & Budd's regular course of business. The Baron & Budd Defendants' regular course of business is the practice of law, and, in particular, the representation of individuals who claim to have been harmed by toxic substances, including asbestos. *See* www.baronandbudd.com/About (last visited June 26, 2002). As discussed above, mass tort litigation spawns numerous documents and requires that they be filed by certain deadlines. Certainly, Baron & Budd must very often take and file the affidavits of its clients as part of the regular course of business. Holdings also alleges that the falsification of the affidavits were part of a larger scheme that was part of Baron & Budd's regular course of business. Holdings alleges that the Baron & Budd defendants falsified claims forms filed by the Baron & Budd bankruptcy department, implemented and used firm policies to encourage false testimony, and intentionally gathered false testimony to support personal injury claims against former asbestos manufacturers. Taking these allegations as a whole, Holdings has sufficiently alleged for the purposes of this motion that there was open-ended continuity as the predicate acts were part of Baron & Budd's regular course of business.

The Defendants argue, however, the scheme is "inherently terminable" and thus cannot constitute open-ended continuity. *GICC*, 67 F.3d at 466; *see also First Capital Asset Mgmt., Inc. v. Brickelbush,*

150 F.Supp.2d 624, 634 (S.D.N.Y.2001) ("[T]he scheme here is 'inherently terminable' in that it necessarily ended with the bankruptcy to which it was related."). The Defendants point to the bankruptcy of asbestos manufacturers, including GAF, as the inevitable terminus of the scheme. Compl. ¶ 3 ("This avalanche of asbestos lawsuits ... has driven more than two dozen once prosperous companies into bankruptcy including, just since the beginning of 2000, such major companies as Owens Corning, The Babcock & Wilcox Company, Armstrong World Industries, Pittsburgh Corning Corporation, and W.R. Grace & Co.").

The scheme is not inherently terminable, however, as asbestos litigation continues to this day. *E.G., In re Asbestos Litigation*, 2002 WL 1378959 (R.I.Super. Jun 20, 2002); *see also* N.Y.L.J., Verdicts and Settlements (July 1, 2002) (reporting on jury verdicts in asbestos-injury case in New York Supreme Court on May 31, 2002); Patti Bond, Asbestos Verdict vs. G–P Upheld, Atlanta J. & Atlanta Const. at D.1, 2002 WL 3725935 (June 12, 2002) (noting that a Maryland appeals court had upheld $9 million verdict against Georgia–Pacific and that company stated that the award "will not affect its ability to defend the other cases); Nat'l L.J., $5.6 Million in Punitives Was Awarded to Smoker, at B2 col. 1 (June 10, 2002) (reporting on jury verdict in asbestos-related case). In addition, the past behavior of plaintiffs' attorneys in asbestos cases is instructive. After the first major bankruptcy of a asbestos manufacturer in 1981, "plaintiffs' attorneys began looking for anyone else who was culpable." Next Wave of Asbestos Filings Will Stretch on as Companies Buckle Under Weight, 39 No. 15 Bankr. Ct. Dec. (LRP) 1 (June 18, 2002). There is good reason to assume that the more recent filings similarly will not deter the effort to prosecute asbestos claims. *Id.* In

any case, to suggest that the scheme is "inherently terminable" because at some point in the future the Defendants will no longer be able to descry potential asbestos-injury defendants because they will have financially ruined all their other prospects is too tenuous—and fantastical—an argument to succeed at this stage.

. Holdings therefore has pled open-ended continuity.

### 3. *Existence of a RICO Enterprise*

In order to satisfy section 1962(c)'s requirement, a plaintiff must plead each defendant's participation in the "operation or management" of an "enterprise" as those terms are defined for the purposes of the statute. *Dietrich v. Bauer*, 76 F.Supp.2d 312, 347 (S.D.N.Y.1999) (*citing Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)). An enterprise within the meaning of RICO requires an "association in fact" between or among individuals and entities. 18 U.S.C. § 1961(4); *see also Kashelkar v. Rubin & Rothman*, 97 F.Supp.2d 383, 391 (S.D.N.Y.) ("[T]o plead an enterprise, plaintiff must allege facts showing a group of persons associated together for a common purpose, which is proved by evidence of an ongoing organization ... and by evidence that the various associates function as a continuing unit.") (internal quotation marks omitted), *aff'd* 242 F.3d 365 (2d Cir.2001).

Because § 1962(c) speaks separately of a RICO "person" acting on or conducting the affairs of the "enterprise," which clearly envisions two entities, *Bennett v. United States Trust Co.*, 770 F.2d 308, 315 (2d Cir.1985), a plaintiff must also comply with the rule that the RICO "person and enterprise referred to must be distinct." *River-*

*woods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339, 344 (2d Cir.1994).

#### a. *Count V*

 The sole defendant in Count V is the law firm Baron & Budd. It is charged with conducting the "Baron & Budd Association–in–Fact Enterprise" (the "B & B Enterprise") through a pattern of racketeering activity consisting of acts of mail and wire fraud related to the falsification of evidence in asbestos cases and the carrying out of the extortionate threats during 1999 and 2000 through the filing and instigation of fraudulent asbestos actions against Holdings.

The B & B Enterprise is defined as an "association in fact of Baron & Budd, its various local counsel, various doctors and/or various unions." TAC ¶ 203. Holdings has alleged that the law firm Baron & Budd is part of, but smaller than, an ongoing existing enterprise that includes other law firms, trade unions, and doctors. Further, it alleges that each of the participants in that enterprise has a specific role: the trade unions locate plaintiffs; Baron & Budd and the doctors manufacture evidence; and local counsel process cases through courts around the country. Holdings further alleges that this collection operates under the overall direction of Baron & Budd.

The Defendants suggest that the local counsel, unions and doctors are merely agents of the Defendants and thus fail the distinctiveness requirement.

Under Second Circuit case law prior to *Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001), it is clear that if the additional entities are merely agents acting within the scope of their employment, there cannot be an enterprise. *E.g. Riverwoods*, 30 F.3d at 344–45. Holdings suggests that

*Cedric Kushner* has stretched this rule.[11] There is no need to determine this unsettled issue because, taking the facts in the light most helpful to Holdings, the Complaint fits under the *Riverwoods* rubric. Even if the local counsel, unions and doctors are Baron & Budd's agents—which Holdings contests—they were not acting within the scope of the agency. Viewing Holdings' complaint under the applicable standard, the allegations of Holdings' RICO claim can fairly be read to allege that Baron & Budd and its agents went beyond conducting the normal affairs of Baron & Budd, and were acting on behalf of the enterprise with the goal of encouraging large settlements from GAF and others for their own benefit through the device of the enterprise.

### b. *Count VI*

█ Count VI alleges the same wrongdoing against individual defendants Baron and Budd. Messrs. Baron and Budd are the "persons." Holdings alleges two enterprises: the B & B Enterprise, discussed above, and the law firm itself.

This situation falls squarely under the rule of *Cedric Kushner*. In *Cedric Kushner*, the Supreme Court upheld a RICO claim against fight promoter Don King, who as the "person" was alleged to have conducted an "enterprise" consisting of a corporation in which he was the sole shareholder. 533 U.S. at 166, 121 S.Ct. 2087. The Court held that "the corporate owner/employee, a natural person, is distinct from the corporation itself, a legally differ-

ent entity with different rights and responsibilities due to its legal status. And we can find nothing in the statute that requires more 'separateness' than that." *Id.* at 163, 121 S.Ct. 2087.

Similarly, Fred Baron and Russell Budd, as named partners and members of the law firm of Baron & Budd, are separate and distinct legal entities from the law firm they control, and which in turn purportedly controls the B & B Enterprise.

Defendants also argue that Holdings has failed to allege how Messrs. Baron and Budd participated in or oversaw the underlying actions which constitute the mail and wire fraud claims. The complaint, however, does allege that the individual defendants were responsible for implementing and maintaining the policies at Baron & Budd and for supervising the law firm's attorneys and personnel. Compl. ¶¶ 230, 232. Further, the Complaint states that Messrs. Baron and Budd caused the employees of the law firm and the members of the B & B Enterprise to target GAF, decline to settle cases with GAF, and focus the on-going subornation of perjury through bogus identifications of Calsilite. At the very least, the last allegation regarding bogus identifications of Calsilite covers the specific predicate acts alleged and permits the claim to survive this motion to dismiss on this ground.

### 4. *Holdings Has Standing*

Defendants challenge Holdings' standing, alleging that it has not alleged reasonable reliance and proximate cause.

---

**11.** *E.g. Wiwa v. Royal Dutch Petroleum Co.,* 2002 WL 319887, at *23 (S.D.N.Y. Feb.28, 2002) ("[A]lthough some authority weighs against recognizing an 'enterprise' that is comprised of a corporation and its agents or subsidiaries, recent Supreme Court case law suggests that the 'distinctiveness' requirement imposed by Section 1962(c) is not as rigid as prior circuit precedent suggests."); *see also*

*Chen v. Mayflower Transit, Inc.,* 159 F.Supp.2d 1112, 1114–15 (N.D.Ill.2001) (*citing Cedric Kushner* for the proposition that the formal legal distinction created by incorporation is sufficient for the RICO statute and holding plaintiff pleaded RICO enterprise comprising common carrier corporation and its local agents).

### a. *Reasonable Reliance*

■ As part of a fraud-based RICO complaint, plaintiff must plead detrimental and justifiable reliance on defendant's misrepresentations. *Metromedia*, 983 F.2d at 368 ("In the context of an alleged RICO predicate act of mail fraud, we have stated that to establish the required causal connection, the plaintiff was required to demonstrate that the defendant's misrepresentations were relied on.") (*citing County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1311 (2d Cir.1990)).

Defendants allege that Holdings has failed to allege reasonable reliance on the allegedly false affidavits because (1) GAF could not reasonably rely on the sworn affidavits, and (2) Holdings fails to allege a number of specific things about the affidavits it purportedly received from Baron & Budd.

The former argument has been rejected above. Further, Defendants fail to present case law that supports the latter point, which appears to rehash their Rule 9(b) arguments.[12] For the reasons discussed in greater length in Part I.C., Holdings has satisfied Rule 9(b) for the purposes of a motion to dismiss and, in the absence of any case law requiring a separate showing of specificity for the purposes of demonstrating standing, the motion to dismiss on this ground is denied.

### b. *Proximate Cause*

Defendants also allege that Holdings has failed to allege proximate cause.[13]

■ RICO grants standing to sue to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). This language limits standing to plaintiffs whose injuries were both factually and proximately caused by the alleged RICO violation. *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 234 (2d Cir.1999) (*citing Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)). While the term "proximate cause" is utilized, the Second Circuit has made clear that liability under statutes such as RICO does not "depend on whether there is proximate causation as that term is used at common law." *Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 237 (2d Cir.1996). Instead, the question is whether the plaintiff was "in the category the statute meant to protect," and whether "the harm that occurred [was] the 'mischief' the statute sought to avoid." *Id.; see also BCCI Holdings (Luxembourg), Societe Anonyme v. Phar-*

**12.** Defendants first cite to *G–I Holdings*, 179 F.Supp.2d at 262, which did not even discuss the specific allegations of "fixed" affidavits as those allegations were not part of the FAC. Further, the cited section addresses the requirements of Rule 9(b). Defendants cite only one other case for this proposition in their Reply Memorandum, but the portion cited similarly involves a discussion of Rule 9(b). *Associated Wrecking, Inc. v. Local 95 Pension Fund*, 1994 WL 118987, at *5 (S.D.N.Y. March 31, 1994) (dismissing RICO mail and wire fraud claims for, *inter alia*, failure to allege specific times and places that documents were sent). In their Memorandum, Defendants also quoted *Grumman Allied Indus. v. Rohr Indus.*, 748 F.2d 729, 737–38

(2d Cir.1984), which deals generally with reliance and not with the fact specific situation here. *Id.* ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.")

**13.** The Defendants appear to concede this argument in their reply memorandum and focus instead on the reliance argument. Defs.' Reply Mem. at 25 ("Proximate Cause Cannot Substitute for the Reliance Requirements"). Because they did not expressly do so, it nevertheless will be discussed.

*aon*, 43 F.Supp.2d 359, 365 (S.D.N.Y.1999). Thus, to have standing, plaintiffs must show that they were "the intended targets of the RICO violations" and that any alleged RICO injury must have been the "preconceived purpose" of the RICO activities. *In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994) (*citing Sperber v. Boesky*, 849 F.2d 60, 64–65 (2d Cir.1988)).

Holdings has alleged that GAF was an intended target of the RICO violations. Further, it has alleged that the injury it purportedly suffered—the payment of higher settlements (and the Defendants' concomitant receipt of more generous legal fees)—was the preconceived purpose of the violations. This is sufficient to allege standing.

The Defendants' motion to dismiss Counts V and VI is denied.

### D. *Count VII: RICO Witness Tampering Claim Is Dismissed*

Holdings has reasserted its former Count VI concerning witness tampering allegations as Count VII for the sole purpose of clarifying the reason for dismissal. In the First Amended Complaint, Holdings alleged that all the Defendants violated the witness tampering statute, 18 U.S.C. § 1512, in that they attempted to and did use intimidation to corruptly persuade former asbestos producers not to testify before Congress regarding the Fairness in Asbestos Compensation Act ("FACA"). That count was dismissed as to the Georgia Pacific allegations on several bases. 179 F.Supp.2d at 265–67.

Count VII of the Third Amended Complaint now asserts witness tampering predicate acts other than those related to Georgia Pacific. Holdings acknowledges that it cannot distinguish the facts alleged as to the non-Georgia Pacific witnesses from those alleged and dismissed as to Georgia

Pacific. However, it claims to have addressed and satisfied one of the shortcomings found above, that Holdings had not sufficiently alleged that the witnesses were in fact expected to testify before Congress. 179 F.Supp.2d at 265.

It was earlier held that "[a]t a minimum, Holdings would need to allege an intent to induce someone not to testify or to testify falsely at an actual official proceeding." *Id.* at 265. Holdings has amended its pleading to allege specifically that Defendants intended to prevent GAF, Heyman, and other members of the Coalition for Asbestos Resolution from testifying before Congress in support of FACA, or to cause their testimony to be less favorable to Defendants. The Complaint alleges:

"265. As described above, upon information and belief, defendants attempted to and did use intimidation, threatened, and corruptly persuaded former asbestos producers with the intent to prevent their testimony before Congress and to cause them to withhold their testimony from Congress, in violation of 18 U.S.C. § 1512(b).

(a) With respect to GAF and Mr. Heyman, defendants had actual knowledge that Mr. Heyman was expected to be a witness in Congressional hearings on FACA, as indeed he was. The conduct alleged above was undertaken with the specific intent of causing Mr. Heyman not to appear or, if he did appear, to moderate his testimony to be less unfavorable to defendants.

(b) With respect to the other former asbestos manufacturers, defendants actually and correctly believed that some of their number would be called (or would voluntarily appear) as witnesses in those hearings. The conduct alleged above was undertaken with the specific intent of causing

these individuals not to appear or, if they did appear, to moderate their testimony to be less favorable to defendants.

Complaint, ¶ 265.

These allegations are sufficient to allege an intent to induce someone not to testify or to testify falsely at an actual official proceeding. However, as Holdings acknowledges, Count VII is dismissed for the other reasons identified in the earlier opinion. The Defendants' motion to dismiss Count VII is granted.

### E. *Count XI: Holdings Again Has Failed to Distinguish Its Fraudulent Inducement and Breach of Contract Claims*

■ For its breach of contract claim, Holdings alleges that defendants Weitz & Luxenberg and Ness Motley each breached the Futures Agreement by "failing to recommend to its non-sick clients that they defer filing asbestos claims until they met the medical criteria set forth" in those Futures Agreements. Compl. ¶ 289, 299. For its fraudulent inducement claim, Holdings alleges that it was fraudulently induced to make a $200 million payment in a transaction that was separate and apart from the parties' obligations under the Futures Agreements. *Id.* at ¶¶ 306–09.

■ As noted in the earlier opinion, to sustain a claim for fraudulent inducement alongside a claim for breach of contract under New York law, one must plead any one of the following: (i) a legal duty separate from the duty to perform under the contract; (ii) a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) special damages that are caused by the misrepresentation and unrecoverable as contract damages. *G–I Holdings,* 179 F.Supp.2d at 269 (*citing Blank v. Baronowski,* 959 F.Supp. 172, 180 (S.D.N.Y.1997) (*citing Bridgestone/Fire-*

*stone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13, 20 (2d Cir.1996))).

As a result, Holding's fraudulent inducement claim was dismissed previously as indistinguishable from its breach of contract claims:

Holdings contends the fraudulent inducement claim is based on a $200 million payment plaintiff made toward a $750 million settlement of certain asbestos claims in reliance on the Defendants' representations that they would perform under the Futures Agreement. The Futures Agreement itself is alleged to consist of CCR agreeing to toll the statute of limitations on numerous asbestos claims in exchange for a promise that, subject to the exercise of their professional judgment, Defendants Weitz & Luxenberg and Ness Motley would recommend to their non-sick clients that they seriously consider deferral of their claims. However, ¶ 138 of the Complaint states that "the consideration for the Futures Agreements included CCR's agreement to settle some 50,000 pending asbestos cases for approximately $750 million." This allegation belies Holdings' contention that the settlement was an independent agreement and represents damages not recoverable in contract.

The claim apparently is that the partial settlement payment was made in reliance on the representation that the Futures Agreements would be complied with. Though Holdings contends this agreement is extraneous to the contract, and that damages arising therefrom could not be recovered in contract, the claim is not sufficiently distinguishable from the underlying contract claim. A viable fraudulent misrepresentation claim requires that the misrepresentation pertain to facts that are "collateral or extraneous" to the contract, . . . not

that the plaintiff participated in a separate "event" based on statements contained in the contract, as plaintiff currently asserts.

*Id.*

In response to the opinion, Holdings has altered former Paragraph 138[14] to state:

Ness Motley, Weitz & Luxenberg and the Affiliated Law Firms used the Futures Agreements and their explicit and implicit (but false and fraudulent) promises to perform thereunder to induce CCR's agreement to settle some 50,000 pending asbestos cases for approximately $750 million [of which GAF contributed approximately $200 million].

Compl. ¶ 162.

Holdings has failed to cure the defect identified in the earlier holding. It still does not allege that an independent agreement existed. By its statement that Defendants somehow "used" the Futures Agreements and the promises to perform them to "induce" the settlement, Holdings alleges again that the Futures Agreements promises were the very inducement that led to the settlement. This raises the same problem found in the First Amended Complaint: "[t]he claim apparently is that the partial settlement payment was made in reliance on the representation that the Futures Agreements would be complied with." *Id.* at 269.

Because Holdings has not altered the failing identified in the earlier opinion, the Defendants' motion to dismiss Count XI is granted.

### F. *Count XII States a Common Law Fraud Claim Against Baron & Budd*

■ Count XII is premised on the same allegations that form the basis of the existing RICO mail and wire fraud count and is alleged only against defendant law firm Baron & Budd. Holdings essentially alleges that Baron & Budd paralegals, at the behest of a supervisor, "fixed" approximately 200 affidavits by filling in missing information without seeking client approval or assistance. GAF then relied on these falsified affidavits in settling the cases.

■ To plead a claim of fraud under New York law, plaintiffs must allege five elements: (1) misrepresentation of a material fact; (2) the falsity of that representation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance. *May Dep't Stores v. Int'l Leasing Corp.*, 1 F.3d 138, 141 (2d Cir.1993).

Baron & Budd argues that Count XII should be dismissed because it fails to meet specificity requirements, does not allege justifiable reliance, and is improperly based on information and belief. The first two allegations have already been discussed and rejected, *supra.*

■ As for the third, fraud pleadings generally cannot be based on information and belief. *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1003 (2d Cir.1988). However, fraud allegations may be so pleaded as to facts peculiarly within the opposing party's knowledge. *Id.* (citations omitted). Even then, the allegations must be accompanied by a statement of facts upon which the belief is founded, *id.*, and this rule "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990) ("Where pleading is permitted on information and belief, a complaint must adduce

---

**14.** Former Paragraph 138 stated in pertinent part: "The consideration for the Futures Agreements included CCR's agreement to set- tle some 50,000 pending asbestos cases for approximately $750 million."

specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard.").

Baron & Budd challenges the sufficiency of Holdings' claim that "[o]n information and belief," the "200 or so" false affidavits resulting from the paralegals' "fixing" "is contained within the set of 190 cases listed in Exhibit D." Compl. ¶ 90.

Which of the 190 cases—if any—contain the allegedly falsified information is, at this moment, peculiarly within the opposing party's knowledge. Holdings' discovery of the falsifications is relatively recent, and it has been unable to engage in the sort of discovery that would make this allegation more clear. Moreover, Holdings has provided a statement of facts elucidating how it came to the conclusion that at least some of these 190 cases contained falsified affidavits. Therefore, at this stage of the pleading, pleading this aspect of the claim on information and belief is sufficient.

Therefore, Baron & Budd's motion to dismiss Count XII is denied.

### G. *Count XIII: Claim of Common Law Fraud Against Weitz & Luxenberg Fails to State a Claim with Specificity*

In Count XIII, Holdings asserts that Weitz & Luxenberg "backdate[d] documents filed in asbestos personal injury cases and ... tamper[ed] with and falsif[ied] records of the Supreme Court of the State of New York." Compl. ¶ 97. Specifically, Holdings contends that in approximately May 2000, in an unidentified case that was then pending in Supreme Court, New York County, Weitz & Luxenberg realized that it had failed to amend a complaint in a timely fashion, and thus drafted a backdated complaint. *Id.* ¶¶ 98, 101. Then, Weitz & Luxenberg enlisted the aid of a court employee related to Weitz & Luxenberg paralegals who stamped the amended complaint with an earlier date and placed a false entry into the court's log book so that it appeared as if the complaint had been filed prior to the expiration of the limitations period. *Id.* ¶¶ 101–02, 104–05. Holdings also alleges that this backdating was not an "isolated incident" and that it occurred in other unnamed cases. *Id.* ¶ 106.

Holdings has failed to satisfy Rule 9(b)'s requirements with these allegations. Holdings alleges a particular incident of backdating in May 2000 and generally alleges "other occasions" in which the same occurred. Holdings does not appear to challenge that the allegations regarding "other occasions" lack sufficient specificity,[15] but does argue that it has met the requirements of Rule 9(b) with regard to the May 2000 incident in that it has alleged (1) the statements that were fraudulent (the false filing date); (2) identified the speaker (Weitz & Luxenberg); (3) where and when the statement was made (at the New York Supreme Court, 60 Centre Street, New York, New York in mid-May 2000); and (4) why the statement was fraudulent (the "filed" stamp did not reflect the true date on which it was filed with the court). *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993).

Yet the Complaint fails to identify, *inter alia:* (1) any of the cases (or even group of cases) in which Weitz & Luxenberg purportedly backdated the amended complaints; (2) the claimant in the case; (3) the asbestos manufacturers in the case;

---

15. Such defense would be fruitless. Holdings fails to allege even a time frame for these "other occasions" much less the other more specific information that Holdings also fails to allege with regard to the alleged May incident.

and (4) when the statute of limitations began to run or expired.

Holdings acknowledges that the identity of the specific case in which this backdating occurred is missing, but states that the information is "particularly within the defendants' control and awaits discovery to obtain the necessary physical evidence." Pl.'s Mem. at 56. This information is not particularly within Weitz & Luxenberg's control, as Holdings was able to obtain at least partial information from an interview with an unnamed source. In any case, Holdings should be able to identify at least a group of cases [16]—if not the actual case itself—based on New York Civil Practice Law and Rules.

Pursuant to C.P.L.R. Section 306–b, a complaint must be served within 120 days of its filing.[17] Therefore, the "backdated" amended complaint could not have been backdated to a date more than 120 days prior to mid-May (because it then would not have been timely served)[18] and yet must have been served after mid-May (when the backdating allegedly occurred). As a result, Holdings has several distinguishing characteristics: the document is an amended complaint where Weitz & Luxenberg served as plaintiffs' counsel, and it should have been served on GAF less than 120 days after mid-May 2000, with a filed date of less than 120 days prior

to mid-May 2000. Given these characteristics, Holdings should have delimited the universe of cases to ones meeting these criteria.

The identity of the backdated complaint involved is important because Holdings must do more than conclusorily allege that GAF was a defendant in that complaint[19] and so "incurred expenses in defending" it. Compl. ¶ 316.

The allegations further do not satisfy two of the concerns behind Rule 9(b): (1) to provide defendants with fair notice of the claims against them so that they may prepare a defense; and (2) to protect defendants from harm to their reputations and good will by unfounded allegations of fraud. *DiVittorio*, 822 F.2d at 1247. Holdings finally suggests that its allegations satisfy the first concern, relying on statements from a Weitz & Luxenberg spokesman in response to these allegations. Mark Hamblett, Weitz & Luxenberg Responds to Charges It Falsified Documents, N.Y.L.J., April 12, 2002, at 1; Mark Hamblett, Weitz & Luxenberg Accused of Falsifying Documents, N.Y.L.J., March 20, 2002, at 1. However, this argument is disingenuous as Weitz & Luxenberg's general denials in the legal press cited above are not the type of defense contemplated by Rule 9(b).

---

16. For instance, it was sufficient at this stage of the proceedings for Holdings in Count XII to identify a group of cases that likely contained the falsified affidavits.

17. Section 306–b provides:
Service of the summons and complaint … shall be made within one hundred twenty days after their filing. … If the service is not made upon a defendant within the time provided in this section, the court, upon motion, shall dismiss the action without prejudice as to that defendant, or upon good cause shown or in the interest of justice, extend the time for service.

18. If the purportedly backdated amended complaint was not served within 120 days of the purported stamp, Holdings could not reasonably have relied on it as such complaint would be subject to summary dismissal pursuant to § 306–b.

19. Holdings does not directly state that it was a named defendant; rather it states that "[t]he named defendants" relied on the false date, Compl. ¶ 315, and that Holdings "incurred expenses in defending" the complaint. *Id.* at ¶ 316.

Weitz & Luxenberg's motion to dismiss Count XIII is therefore granted, but leave to replead is permitted for this claim alone. As discussed below, Holdings at oral argument stated that it did not seek leave to replead its complaint after this iteration. Nonetheless, this is the first time Holdings has pressed this claim. Further, if Holdings can identify the amended complaint that was backdated—or at least a group of potential cases—and can otherwise add greater specificity to the allegations, then Holdings may have a viable claim and should have the opportunity to replead it.

### H. *Leave to Replead Is Denied Except as to Count XIII*

Holdings has had four chances over the course of more than fifteen months to prepare its complaint, and has received a lengthy opinion that has addressed the elements and pleading requirements for most of the claims asserted here. In addition, counsel for Holdings stated at oral argument on May 15, 2002, that Holdings did not seek leave to replead.[20] For these reasons, leave to replead is denied on all of the claims except for Count XIII.

### II. *Motion To Strike*

■ The Ness Motley Defendants have moved to strike the following "scandalous" allegations from the Third Amended Complaint pursuant to Fed. R. Civ. Proc. 12(f):

Upon information and belief, defendant Ness Motley provided ... inducement to medical experts to obtain their favorable testimony. Upon information and belief, certain of Ness Motley's female secretaries and paralegals were expected to, and did, "entertain" expert witnesses

who would visit the firm in connection with pending asbestos litigation. Upon information and belief, at least one partner of the firm indicated to his secretary that she should have sex with a particular expert witness, and defendant Motley supplied several female employees with cash and encouraged them to "be nice to" certain of the firm's expert and out-of-state counsel.

Compl. ¶ 109. Ness Motley contends that the above allegations are immaterial and prejudicial.

Fed. R. Civ. Proc. 12(f) provides:

Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

Fed. R. Civ. Proc. 12(f).

As an initial matter, Holdings challenges the timeliness of Ness Motley's motion.

■ Although Rule 12(f) allows motions to strike only up to the time a party responds to a pleading, it also permits a court to strike such material on its own initiative at any time. Fed.R.Civ.P. 12(f). As the very case cited by Holdings makes clear, "this provision has been interpreted to allow courts to grant meritorious motions to strike even when they are untimely." *Phillips v. Dalton*, 1997 WL 24846, at *3 n. 8 (E.D.Pa. Jan.22, 1997) (denying motion because material was not sufficient-

---

20. Counsel stated that Holdings may wish to amend the complaint if the Special Master's investigation yields more information. If particularly specific facts leading to meritorious claims are uncovered, Holdings may *move* to replead. Holdings may not replead as of right except as to Count XIII, and any such pleadings without seeking leave of court will be summarily dismissed.

ly prejudicial, rather than due to untimely filing); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1380, at 652–54 (2d ed.1990); *Wine Markets Int'l Inc. v. Bass*, 177 F.R.D. 128, 133 (E.D.N.Y.1998) ("In effect, the Court's discretion renders the [rule requiring a motion to strike prior to response to a pleading] 'essentially unimportant.' ") (citation omitted). *But see Eaton v. American Media Operations, Inc.*, 1997 WL 7670, at *5 (Jan. 9, 1997) (dismissing motion to strike as untimely because not filed prior to filing responsive pleading). Therefore, it is necessary to determine whether Ness Motley's motion is meritorious.

■■■■ The Court of Appeals has cautioned district courts to approach such motions with caution: "[I]t is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible.... Thus the courts should not tamper with the pleadings unless there is a strong reason for doing so." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). In spite of this reluctance, allegations may be stricken if they have no real bearing on the case, will likely prejudice the movant, or where they have criminal overtones. *Toto v. McMahan, Brafman, Morgan & Co.*, 1995 WL 46691, at *16 (S.D.N.Y. Feb.7, 1995) (citation omitted); *see also* 5A Wright, Miller & Marcus, *Fed.*

*Prac. & Proc.: Civil 2d* § 1382, at 714 (West 1994 & Supp.2001) ("[S]candalous allegations ... will often be stricken from the pleadings in order to purge the court's files and protect the subject of the allegations.")

■■■■ As a result of Part I of this opinion, only three claims remain against Ness Motley: (1) tortious interference with business relations[21] (Count II); (2) tortious interference with contract[22] (Count III); and (3) breach of contract[23] (Count X).

Counts II and III allege that all the defendants, including Ness Motley, "caused CCR to expel GAF," carrying out their "extortionate threats ... to coerce GAF to cease its efforts to lobby Congress for passage of the [FACA]...." Compl. ¶¶ 182–83. The only possible materiality of the allegations are to provide background regarding the strength of the "improper" means, the purported "extortionate threats." This background has "no real bearing on the case."

Count X alleges a breach of the Futures Agreement by Ness Motley's "failing to recommend to its non-sick clients that they defer filing asbestos claims until they met the medical criteria set forth" in the Agreement. Compl. ¶ 209. The allegations have no bearing on whether Ness Motley breached the Futures Agreement.

In addition to the lack of relevance of the allegations, they are also prejudicial.

---

**21.** Under New York law, the elements of tortious interference with a business relationship are: (1) interference by the defendants with an existing contract or business relationship; (2) the interference was accomplished by dishonest, unfair, or improper means or was done intentionally; and (3) damages therefrom. *Martin Ice Cream Co. v. Chipwich Inc.*, 554 F.Supp. 933, 945 (S.D.N.Y.1983) (citation omitted).

**22.** The elements of tortious interference with a contract are: (1) the existence of a valid contract between plaintiffs and a third party;

(2) that the defendants had knowledge of it; (3) the defendants intentionally procured a breach by the third party; and (4) damages therefrom. *Id.*

**23.** Under New York law, the elements of breach of contract are: (1) a valid contract; (2) plaintiff's due performance; (3) breach by defendants; and (4) damages from breach. *E.g., R.H. Damon & Co. v. Softkey Software Prods. Inc.*, 811 F.Supp. 986, 991 (S.D.N.Y. 1993).

They are amorphous, unspecific and cannot be defended against. Further, the allegations, which have been publicized, harm Ness Motley in the public eye and could influence prospective jury members.

Holdings cites the myriad media reports concerning these allegations to suggest that any prejudice has already occurred and that striking the allegations will not cause the legal community, the public or a jury to ignore the proverbial white elephant standing in the corner of the room. If a party has suffered prejudice as a result of scandalous allegations—as is likely here—the solution under Rule 12(f) is not thereafter to ignore the party's plight. The portion is therefore stricken.

### Conclusion

For the foregoing reasons, the Defendants' motion to dismiss is granted in part and denied in part. Counts VII, XI and XIII are dismissed, but leave is granted to replead Count XIII. Further, Counts I, IV, and VIII were previously dismissed, and Holdings did not replead them. As a result, the following claims remain: (1) Count II (tortious interference with economic advantage against all defendants); (2) Count III (tortious interference with contract against all defendants); (3) Count V (RICO mail and wire fraud against Baron & Budd); (4) Count VI (RICO mail and wire fraud against the individual defendants Baron and Budd); (5) Count IX (breach of contract against Weitz & Luxenberg); (6) Count X (breach of contract against Ness Motley); and (7) Count XII (common law fraud against Baron & Budd).

In addition, Ness Motley's motion to strike is granted.

It is so ordered.